915 A.2d 587 (2007)
390 N.J. Super. 344
STATE of New Jersey, Plaintiff-Respondent,
v.
Michael KING, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 2005.
Remanded August 25, 2005.
Re-Argued September 20, 2006.
Decided February 6, 2007.
*589 Jean D. Barrett, Montclair, argued the cause for appellant (Ruhnke & Barrett, attorneys; Ms. Barrett, on the brief).
Gary A. Thomas, Assistant Prosecutor, argued the cause for respondent (Paula T. Dow, Essex County Prosecutor, attorney; Mr. Thomas, of counsel and on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and SABATINO.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted of carjacking, N.J.S.A. 2C:15-2a(1),(2), and (3), armed robbery, N.J.S.A. 2C:15-1, unlawful possession of a weapon, N.J.S.A. 2C:39-5b, and possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4a. He was subsequently convicted by the same jury of possession of a weapon by a convicted felon, N.J.S.A. 2C:39-7b. The conviction of possession of a weapon for an unlawful purpose was merged into the carjacking and robbery convictions, and defendant received concurrent sentences aggregating twenty-five years with 85% to be served before parole eligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.
The charges stemmed from a January 6, 2001 incident, in which Tynetta Kareem was approached as she sat in the car of her friend, Vicky Leonard. A man brandished a handgun and directed Kareem to exit the vehicle. He then demanded Kareem's jewelry and ripped it off her when she failed to comply with his request quickly enough. The perpetrator then drove away in the vehicle, which also contained both the handcuffs of both Kareem and Leonard.
*590 Three days later, police officers approached Leonard's vehicle after an unidentified individual claiming to be Leonard's brother saw it parked on a street in Newark. Alterick Hamlet was seated in the driver's seat. Defendant was in the passenger seat. Police officers arrested the two individuals, called Kareem to the police station, and showed her defendant's picture in a photographic lineup. Kareem identified him as her assailant. The trial court initially suppressed testimony regarding defendant's out-of-court identification, because the original photographic lineup was misplaced but later admitted the evidence when the lineup was located. There is no contention that the evidence, if admissible, was insufficient or that the conviction was against the weight of the evidence.
In his original brief on this appeal, defendant argued that:
POINT I
THE ADMISSION INTO EVIDENCE OF THE TESTIMONY CONCERNING THE INHERENTLY UNRELIABLE OUT-OF-COURT AND IN-COURT IDENTIFICATIONS BY TYNETTA KAREEM DEPRIVED [HIM] OF DUE PROCESS OF LAW GUARANTEED BY THE UNITED STATES AND NEW JERSEY CONSTITUTIONS
POINT II
THE SUPPRESSION OF THE TESTIMONY OF MR. KING'S ALIBI WITNESS VIOLATED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.
POINT III
THE TRIAL JUDGE ERRED WHEN IT PERMITTED THE SOLE DEFENSE WITNESS TO TESTIFY WHILE WEARING PRISON GARB AND SHACKLES.
POINT IV
THE SENTENCE MUST BE REVERSED BECAUSE THE TRIAL COURT FAILED TO SUBMIT TO THE JURY FOR DETERMINATION BEYOND A REASONABLE DOUBT THE EXISTENCE OF FACTORS WHICH THE COURT USED TO INCREASE THE SENTENCE BEYOND THAT WHICH COULD HAVE BEEN IMPOSED SOLELY ON THE FACTS REFLECTED IN THE JURY VERDICT.
On August 25, 2005, we remanded for resentencing in accordance with State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005) and State v. Abdullah, 184 N.J. 497, 878 A.2d 746 (2005). We also directed the trial court to address the following questions:
1. Was the photographic identification unduly suggestive? When the original photo array was found, the pretrial hearing was not resumed to consider that issue before the photo identification was admitted into evidence. If the trial judge concludes the photographic identification was unduly suggestive, the judge should reconsider his initial determination that the in-court identification was reliable and admissible irrespective of the out-of-court identification.
2. Would the proffered testimony of Edward Weems potentially make a difference in the outcome of the case? To that end, defense counsel may present the testimony of Mr. Weems for purposes of making a record.
3. Did witness Alterick Hamlet testify while dressed in prison clothes and/or while shackled? The parties dispute that question, and the record is unclear. If the answer is "yes" in whole or in part, does the policy of State v. Artwell, 177 N.J. 526, 832 A.2d 295 (2003), and the facts of this case warrant a new trial even though State v. Artwell applies only *591 to "future cases," 177 N.J. at 539, 832 A.2d 295, as a per se rule.
We retained jurisdiction.
On the remand, the trial judge found no basis for granting a new trial. The judge also reimposed the original sentence.
Following the remand, defendant again argues that "[t]he out-of-court identification procedure was unduly suggestive and created a substantial likelihood of misidentification in this case"; "[u]nder the circumstances of this case, where the evidence of Mr. King's guilt consisted solely of the identification testimony of a single witness, the fact that the only defense witness testified in prison garb and handcuffs undermined Mr. King's right to due process of law and a fair trial"; and "[t]he exclusion of Edward Weems' testimony was not harmless beyond a reasonable doubt." We now reverse the conviction and remand for a new trial.[1]
Kareem testified at a pretrial hearing regarding the admissibility of the identification. At approximately 8:30 p.m. on January 6, 2001, Kareem rode as a passenger in Leonard's vehicle, as Leonard drove to another friend's apartment complex. As they arrived, Kareem noticed a person later identified as defendant standing in the street on the driver's side of the vehicle. Kareem testified that she drew attention to the person, asking Leonard, "[l]ook at this guy, what is he up to?" Kareem estimated that the man stood approximately seven feet away from the car. At that time, Kareem noticed the man's hat and looked at his face. Kareem believed "that [the] guy look[ed] familiar."
After arriving at the apartment complex, Leonard left the engine of the car running and went into the apartment to briefly "pick something up" from her friend while Kareem remained in the car. Kareem described the evening as being "dark," but she further stated that the parking lot was under "lights." As Kareem sat in the car, she saw the man she had previously noticed walk past the driver's side and then walk to the passenger side of Leonard's vehicle. The individual said something, and Kareem gestured "what are you talking about[,]" because she did not hear or understand what he said. The individual then "held his coat back" and "showed [Kareem] his gun" as he stood approximately three feet away from the front passenger door. Kareem testified that she looked at the individual's face as he approached but then focused on the gun under his coat.
The individual then screamed at Kareem, "[g]et the F. out of the car." The individual opened the front passenger door, stood "right up on [Kareem]," and stated "[g]et the F. out of the car. I am going to [blow] you f.'g brain out." The individual noticed Kareem's jewelry and demanded she "take [it] off." He then pulled off Kareem's bracelets because she was shaking so badly that she could not take them off herself. Kareem testified that the lighting conditions were sufficient for her to see his face clearly. The entire incident lasted less than five minutes.
As Kareem exited the vehicle, the perpetrator noticed the pocketbook she was wearing around her waist. He told her to "leave that, too." Again, Kareem testified that she was looking "from him to the gun." Finally, Kareem gave up her pocketbook and ran towards the apartment while "screaming." She did not look back *592 but "hear[d] him get in the car." She testified that "it didn't sound like he knew how to drive a stick[,]" because "[h]e was making all this noise trying to get out of the parking lot."
After reaching a point of safety, Kareem contacted the police and gave them a description of her assailant. Kareem described the assailant a having "dark skin" with a height of "about 5'7"," and a weight of "about 165, 170" pounds. Kareem testified that her estimate of 5'7" was based upon the fact "he was about [her] height." Kareem stated that she was 5'7" and "that I could look that person straight in the[ ] face." She said her assailant wore a "dark jacket with a dark hat, dark pants[,]" and he "had a scar or a birth mark . . . standing out" on his face.
After the stolen vehicle was recovered, Kareem went to the police station to look at pictures of potential suspects. Kareem stated that she was presented with six color photographs of black males, "three on the top, three on the bottom." She was then asked if she recognized any of the men as the carjacker, and she said that the officer did not suggest which man to pick out. Kareem also testified that the pictures were of men "approximately the same age" "with the exception of maybe two of them." Finally, Kareem testified that she was "[o]ne hundred percent" certain that she correctly identified the defendant.
On cross-examination, Kareem described the gun as "black . . . with a long barrel" and admitted that she focused her attention on it "[m]ost of the time when [her assailant] wasn't talking . . . because [she] was trying to distinguish whether it was a real gun or not." She further testified that she was "very nervous" and "very afraid[.]" Kareem was also questioned about her statement to the police in which she described the assailant as having "a scar on the left cheek." Kareem denied making the statement and instead asserted that the mark was "on the left side from the eyes to the cheek, probably somewhere in that area." Kareem claimed, however, that she "wasn't looking for a scar" as she reviewed the photos and thus could not recall how many of the photos were of men with scars on their faces. When asked if there was "[a]ny possibility that the person could have been 6'3"," she testified there was no possibility at all.
On redirect, Kareem was asked "[i]f you learn[ed] that [the defendant was] 6'3", would that change your mind that he was the one that did it," and she responded, "no."
Detective Murad Muhammed testified that, based on the description given, defendant's photograph was placed into an array along with five other pictures. Detective Muhammed testified that the color photos were of six black men who had "similar features" and were approximately the same age.
According to Detective Muhammed, on January 10, 2001, Kareem was brought in to look at the photo array and made a "positive identification" of the defendant's photo. Muhammed testified that he did not gesture or in any way suggest who to pick. The detective further described Kareem's resolve as "absolutely certain." After Kareem picked defendant's photo, "she signed the back with her name and the date."
However, while Muhammed retained a photocopy of the array, the police were unable to locate the original photo array that was shown to the victim. Muhammed also stated that he neither knew the defendant's actual height or considered that factor in placing defendant in the photo lineup, and he never compiled a photo *593 array with Hamlet, the driver of the vehicle.
The trial court initially determined that no evidence concerning the out-of-court identification would be admitted unless defense counsel opened the door by questioning why the original photo array was missing. The trial judge also ruled that defense counsel could not suggest that the out-of-court identification had tainted the in-court identification without "opening the door" to the events relating to the original identification.
At the trial, Leonard testified that while in her friend's apartment, she heard Kareem "screaming" and "calling [her] name." Leonard and her friend proceeded to the hallway, where Kareem was "very hysterical." Kareem screamed, "[s]omebody put a gun to me, stol[e] your car and robbed me."
Kareem testified before the jury substantially as she did in the pretrial hearing, but she added some additional details. Kareem noted that she initially focused on the defendant's face because he was talking to her, and she thought "he was somebody trying to just approach me or talk to me." Kareem also stated that defendant did not take the gun out of his pants until he opened the car door, demanded that she take off her bracelets, and started "pulling [her] jewelry off." Kareem again described the gun as being black "with a long black barrel[,]" but also specified that it was metal.
Kareem also testified at trial that after the defendant drove away, she gave the police a description of her assailant. She stated that he was a "[b]lack male, he had dark clothing . . . a scar on his face from his eye to his cheek, somewhere in that area." She later clarified that by reporting that the assailant had either a "[s]car or birthmark, something like that." She further recalled that he was "dark skin[ned]," approximately 165 pounds, and "maybe . . . 5'7" or taller than me." Kareem stated "[h]e was like small frame but he had on a coat, a big coat."
Kareem further testified that as she exited the vehicle, defendant was "standing in front of [her]" with his face approximately "two inches" from hers, and the hat he was wearing did not prevent her from seeing his face. She also gave an in-court identification of defendant of which she was "one hundred percent" "positive[.]"
Finally, Kareem described the photographic lineup consisting of six photos of black men, "three on the top, three on the bottom." Kareem reaffirmed that no one coerced her or told her what to say, and she was "one hundred percent sure[]" that the defendant was the one who carjacked her. Kareem was then presented with the original photographic lineup, which was recovered between the pretrial hearing and the second day of testimony. Kareem acknowledged that she identified and signed picture number five and that picture is of the defendant.[2]
On the remand, the parties stipulated that the photo array introduced at trial was the photo array that was missing during the pretrial hearing but later discovered. No additional testimony was given on that issue, but defendant highlighted the inconsistencies between the defendant's appearance and the description that Kareem gave the police at the scene and prior to viewing the photo array. As noted, Kareem described the assailant as being about five feet, seven inches tall and *594 having a scar on his face from his eye to his cheek; whereas, according to the police report, defendant is six feet, three inches tall and has no scar. The trial judge nevertheless found that the photographic array was "not unduly suggestive," and sustained its admissibility.
Weems and Linda King, defendant's mother, testified at the remand hearing. King was permitted to "clarify" Weems' testimony. Defendant also attempted to call Brian Combs to testify as an alibi witness to corroborate Weems' testimony that he and defendant spent about an hour at the home of Combs' girlfriend on the evening in question. However, the State objected, because defendant gave no notice of his intent to present Combs as an alibi witness until the day of the remand hearing. Defendant then withdrew Combs as a witness.
At the conclusion of the remand hearing, the judge found that Weems failed to present "a coherent statement of the relevant time, [ ] date, and place [which] would have been necessary . . . to affect the verdict in this case."
On the issue of witness Hamlet's attire while testifying, the trial judge had "no independent recollection as to whether or not [Hamlet] was dressed in prison garb and/or shackled." The Assistant Prosecutor who tried the case also stated that she lacked a recollection but emphasized there was no objection to his appearance. However, defendant's trial attorney, Louis Al-Misri,[3] testified that Hamlet testified wearing "Essex County Jail prison garb, two piece prison garb outfit." Counsel also asserted that Hamlet was shackled and wore handcuffs while testifying. Defense counsel testified:
Q And where was Mr. Altaric Hamlet residing at the time that you presented him as a witness?
A Essex County Jail.
Q Do you, how was he dressed when he testified for Mr. King?
A In Essex County Jail prison garb, two piece prison garb outfit. I believe it was at the time orange if I'm not mistaken.
Q And do you recall whether or not he was shackled?
A Yes.
Q And was he, did he have handcuffs on when he testified?
A I believe so, yes.
Q And do you recall where the jury was when, well, Mr. Hamlet was that the first time that he was in court when he testified?
A My recollection is that he was brought in on two discre[te] occasions. The first time he was brought in was because there was an issue as to the voluntariness of his testimony. He was represented by the Public Defender's Office, Essex County Public Defender's Office and an issue arose concerning my having spoken to him. Two different Public Defender[s] came to raise that issue with the Court and as a result [the trial judge] wanted to have a, have testimony from Mr. Hamlet concerning whether or not his testifying was voluntary. So he was brought in. At that time that was outside of the presence of the jury.
Q And what happened when those proceedings were over?
A We, he was removed. We went onto other business. I think Mr. Mercurio was raising some other issues and then when it became time for Mr. Hamlet to testify again he was led back in.

*595 Q Do you remember where he came from or how he was led in? Do you have any recollection of that?
A My recollection is that he was being held in the adjourning court or the court across the hall[,] and he was just led straight in through the doors.
Q And, and who was with him when he was, who led him in?
A Sheriff's Officers.
Q One or more than one?
A I believe there were two.
Q At the, at the conclusion of his testimony do you recall what happened at the end of his testimony when he was, when he was done? Where did he go?
A I assume he went back to where he came from. The Judge told him he could go back to where he came from.
Q Was the jury still here at that point?
A Yes.
Q And did the Sheriff's officers then escort him out of the courtroom?
A They did.[4]
In making his findings on the issue, the trial judge candidly concluded:
The answer to that is while there is nothing definitive in the record I have no reason to dispute Mr. Al-Misri's recollection of the events and find as a matter of fact that Mr. Hamlet was dressed in prison garb and at the very least cuffed when brought in the presence of the jury.
I can certainly relate my ordinary and customary practice with regard to dealing with defense witnesses who were incarcerated at the time of their testimony, but that doesn't mean that I have a specific recollection as to what happened in this case[.] I don't. But Mr. Al-Misri's testimony has the ring of truth because of the fact that, that would have ordinarily been my, my course of action, that is, to allow the witnesses to testify in their prison garb and cuffed, the cuffing for security purposes and prison garb because that's the clothes that they wore, would not, I would not have without, without objection have considered the arguments raised in Artwell which are the arguments that the defense makes here, and they are all very good arguments and, and it causes one pause with regard to the fact that-trial court judges [ ] like [me] may not have considered such weighty issues certainly without the participation of the defense counsel with regard to raising those issues.
The judge concluded, however, that because Artwell was not to be given "retroactive application," he would not order a new trial.
We are convinced that a new trial is required under the totality of circumstances. Although not retroactive regarding the appearance of a defense witness in prison garb, State v. Artwell requires a reversal in this matter because there was no finding, or basis in the record for a finding, of a necessity that Hamlet testify while in restraints. See State v. Artwell, 177 N.J. 526, 530, 537-38, 832 A.2d 295 (2003); see also State v. Russell, 384 N.J.Super. 586, 592-99, 895 A.2d 1163 (App.Div.2006). Moreover, the error cannot *596 be disregarded as "harmless." In so concluding, we do not preclude introduction of the identification testimony at the retrial.
We cannot disagree with the trial judge's assessment that both the out-of-court and in-court identifications were admissible. In order to be admitted into evidence, eyewitness identifications must undergo a two-step analysis established by the United States Supreme Court. State v. Herrera, 187 N.J. 493, 503-04, 902 A.2d 177 (2006); State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988) (citations omitted). First, a court must "ascertain whether the identification procedure was impermissibly suggestive[.]" Herrera, supra, 187 N.J. at 503, 902 A.2d 177. If it is, the court must "decide whether the objectionable procedure resulted in a `very substantial likelihood of irreparable misidentification.'" State v. Madison, supra, 109 N.J. at 232, 536 A.2d 254 (1988)(citing Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968); Neil v. Biggers, 409 U.S. 188, 199-201, 93 S.Ct. 375, 382-83, 34 L.Ed.2d 401, 411 (1972); Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, (1967), 388 U.S. 293, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206)). See also State v. Herrera, supra.
A finding of impermissible suggestibility requires that "all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist." Madison, supra, 109 N.J. at 234, 536 A.2d 254 (quoting State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972)). The court's analysis must look at the facts surrounding the identification procedure to determine the existence of undue suggestibility. See id. at 234-37, 536 A.2d 254. Types of factors to be considered include whether the police told the eyewitness that the photo array contains a picture of a suspect, although that alone is not determinative, and if a defendant's photograph is repeatedly shown in a photo array, though the circumstances of the repetition are determinative of suggestibility. Ibid.
The second step of the analysis asks whether the identification itself was reliable based on the "totality of the circumstances." Id. at 233, 536 A.2d 254. "If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." State v. Madison, supra, 109 N.J. at 232, 536 A.2d 254. In essence, "[r]eliability is the linchpin in determining the admissibility of identification testimony." Ibid. (quoting Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977)).
In assessing the totality of the circumstances, factors enumerated by the United States Supreme Court in Manson, and reiterated by the New Jersey Supreme Court in Madison, "must be weighed against the corrupting effect of the suggestive procedure." Madison, supra, 109 N.J. at 240, 536 A.2d 254 (citations omitted). The factors are "the `opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the time of the confrontation and the time between the crime and the confrontation.'" Id. at 239-40, 536 A.2d 254 (quoting Manson, supra, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154). See also State v. Herrera, supra, 187 N.J. at 501-09, 902 A.2d 177 (finding impermissible suggestivity but *597 sufficient reliability to sustain the admission).
The burden of proof for the admissibility of eyewitness identifications depends on the circumstances under which the identification is being offered. Ordinarily, the burden of "demonstrating by a preponderance of the evidence that the pretrial identification was so suggestive as to result in a substantial likelihood of misidentification" lies with the defendant. State v. Hurd, 86 N.J. 525, 548, 432 A.2d 86 (1981), overruled on other grounds, State v. Moore, 188 N.J. 182, 902 A.2d 1212 (2006).[5] "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, supra, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.
Recognizing that the out-of-court array was ultimately observed by the judge who had the opportunity to review it and found it to be admissible, we are unpersuaded by defendant's claims for its exclusion or for concluding the in-court identification was tainted.
However, proper instructions had to be given to the jury. The police may have suggested to Kareem that they had a suspect when they asked her to review the photo array. There is also no indication she was told the array might not include a photo of the perpetrator. Moreover, she believed that persons in two of the pictures in the array appeared older than the others, and, based on police and eyewitness recollection, only defendant's photo had a facial marking, even though she had described a scar to the police. Furthermore, defendant was eight inches taller than Kareem's initial description, and all of the men in the photo array had facial hair despite the fact Kareem did not describe facial hair in her description of the carjacker. Therefore, while we do not disturb the trial judge's conclusion as to admissibility of the identification based on its "reliability," we also conclude that a more detailed charge directed to the contested facts relevant to the claim of suggestiveness was warranted. See State v. Herrera, supra, 187 N.J. at 509-10, 902 A.2d 177.[6] For example, in State v. Ledbetter *598 the Connecticut Supreme Court required a detailed instruction on suggestivity where victim was not told "that the perpetrator may or may not be present" in the procedure. State v. Ledbetter, 275 Conn. 534, 579, 881 A.2d 290 (2005) (emphasis added).[7] The Ledbetter Court concluded that in circumstances like those before us, the instruction should include a charge to the effect that:
In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the crime charged. That identification was the result of an identification procedure in which the individual conducting the procedure either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator may or may not be in the procedure.
Indicating to a witness that a suspect is present in an identification procedure or failing to warn the witness that the perpetrator may or may not be in the procedure may increase the likelihood that the witness will select one of the individuals in the procedure even when the perpetrator is not present. Thus, such action on the part of the procedure administrator may increase the probability of a misidentification.
This information is not intended to direct you to give more or less weight to the eyewitness identification evidence offered by the state. It is your duty to determine what weight to give to that *599 evidence. You may, however, take into account this information, as just explained to you, in making that determination.
[Id. at 579-80, 881 A.2d 290.]
We believe that, under Herrera, a similar charge was warranted in this case.[8]
In any event, while admissible, the identification testimony was not overwhelming or strong. Based on our careful review of the record, the weakness of the identification testimony adds to our conclusion that defendant was prejudiced by the fact that Alteriq Hamlet, the critical defense witness, testified while in prison garb and handcuffs.
In State v. Artwell, the Supreme Court held that defense witnesses may not appear in physical restraints unless the trial court determines in a hearing, out of the jury's presence and for specific reasons, that the restraints are "necessary to maintain the security of the courtroom." State v. Artwell, supra, 177 N.J. at 537-38, 832 A.2d 295 (2003) (citation omitted). The Court also held that a defense witness is prohibited from testifying in "prison garb." Id. at 539, 832 A.2d 295. The latter holding was expressly made prospective, ibid.; the former was not. Artwell did not apply its ban on defense witnesses testifying in "prison garb" to the witness in that case, and used the term "going forward" to specify that the change in policy was prospective only. Id. at 530, 539, 832 A.2d 295. However, regarding a defense witness testifying while handcuffed, the Court found that "the trial court's failure to state on the record its reasons for requiring defendant's witness to appear in restraints was reversible error." See id. at 530, 538, 832 A.2d 295. As a result, the Artwell Court "vacate[d] defendant's conviction and remand[ed] for a new trial." Id. at 539, 832 A.2d 295. See also State v. Russell, supra, 384 N.J.Super. at 592-99, 895 A.2d 1163 (retroactively applying Artwell to vacate a conviction where a co-defendant testified for the prosecution while shackled and the court failed to hold a hearing to determine the necessity of the shackles).
Here, the trial record reflects no reasons expressed for the restraints. To the contrary, no mention of restraints is made in the original record, thereby necessitating the remand proceedings. Nor was there a charge to the jury relating to Hamlet's appearance. Id. at 538, 832 A.2d 295.
Hamlet's being observed by the jury in prison garb and handcuffs, despite his acknowledged criminal record, may well have had an impact on his credibility. The defendant was found in the passenger seat of the stolen vehicle three days after the carjacking in the presence of Hamlet, and Hamlet was called by defendant to exculpate him. Hamlet testified that he "got the car from Fu" and was arrested for receiving the stolen car, but to his knowledge, defendant had never seen the car before Hamlet gave him a ride that day.[9] The trial judge's factual determination that Hamlet testified while "dressed in prison garb and at the very least cuffed when brought in the presence of the jury[ ]" is supported by the uncontroverted testimony of defendant's trial counsel[10] and not *600 disputed by any testimony by the trial prosecutor.
The State now contends that "there was simply no support for the proposition that the jury observed the witness in handcuffs or shackles." The State offers nothing to rebut the defense counsel's testimony as to Hamlet's appearance. Further, the record supports defense counsel's testimony and the judge's finding that Hamlet testified in prison garb and handcuffs. The trial transcript reveals that when Hamlet was called as a witness, he was "led in" and the judge introduced him to the jury by stating "[l]adies and gentlemen, this is Mr. Hamlet. I am going to ask that he be put on the witness stand."[11] Moreover, at the end of Hamlet's testimony before the jury, the trial judge stated in the presence of the jury, "Mr. Hamlet, please accompany the police officer to your place of accommodation." Read in context, the use of the word "accommodation" must be understood to signify a jail or prison. Under the facts, we cannot find the error was harmless even if, for the sake of argument, the "harmless error" doctrine can apply in a case in which a defense witness testified in handcuffs before Artwell was decided.[12]
Our reversal of defendant's conviction permits a new trial at which the alibi witnesses can testify in light of the notice now given.
The convictions are reversed, and the matter is remanded for a new trial.
NOTES
[1] Defendant no longer challenges the sentence. In defendant's words, "[t]he resentencing is not challenged." We note that the jury specifically found that the carjacking and robbery were each a "crime of violence" for purposes of NERA as it stood at the time of offense.
[2] We have seen a copy of the array with the victim's signature on the back of photo number 5. We note the facial hair on each black male and that the photo of each is essentially of the face and neck area only. We can detect what appears to be a facial mark on what seems to be an enlargement of photo number 5, marked S-5 in evidence, but not on the copy thereof in the array.
[3] A different first name is given on the cover of the trial transcripts, but we use the name he gave while testifying.
[4] The transcript of October 25, 2001 reflects that there was a hearing outside the presence of the jury, attended by Hamlet and his attorney, as to his rights and election to testify despite counsel's advice. At the end of that hearing, the judge called for the jury and the transcript indicates that "the jury [was] brought in" without any indication that Hamlet was excused from the witness stand or left the courtroom. However, the State then introduced exhibits and rested, after which the transcript reveals that Hamlet was called as a defense witness and "Mr. Hamlet is le[]d in."
[5] When a photographic array is misplaced, the burden shifts to the State, and "the State should bear the burden of proving, by clear and convincing evidence, that any in-court identification . . . is derived from an independent source." State v. Peterkin, 226 N.J.Super. 25, 45, 543 A.2d 466 (App.Div.), certif. denied, 114 N.J. 295, 554 A.2d 850 (1988). This case was tried before the Supreme Court's opinion in State v. Delgado, 188 N.J. 48, 902 A.2d 888 (2006), and no issue is raised thereunder or with respect to the recordation of the array.
[6] As the case was tried before State v. Herrera was decided, the trial judge gave the model jury charge relevant to in-court and out-of-court identifications applicable at the time (and to remain in effect until the charge developed in light of Herrera is promulgated with respect to out-of-court identifications. See, Herrera, supra, 187 N.J. at 510, 902 A.2d 177). He included the following:

The State also presented testimony that on a prior occasion before this trial this witness[ ] identified the person, the defendant[,] as the person who committed these offenses.
According to the witness, her identification of the defendant was based upon the observations and perceptions that she made of the perpetrator at the time the offense was being committed. It's your function to determine whether the witness's identification of the defendant is reliable and believab[le] or whether it's based upon a mistake or for any reason not worthy of belief, you must decide whether it is sufficient reliable evidence upon which to conclude that this defendant is the person who committed the offenses charged.
In evaluating the identifications[,] you should consider the observations and perceptions on which the identifications were based and the witness's abilities to make those observations and perceptions.
If you determine that the out of court identification is not reliable, you may still consider the witness's in Court identification of the defendant if you find it to be reliable.
Unless the in Court identification resulted from the witness's observations or perceptions of the perpetrator during the commission of the offense rather than being the product of an impression gained at the out of court identification procedure, it should be afforded no weight. The ultimate issue of the trustworthiness of both the in court and out of court identifications for you to decide. To decide whether the identification testimony is sufficient reliable evidence upon which to conclude that this defendant is the person that committed the offenses charged, you should evaluate the testimony of the witness in light of the factors for considering the credibility that I have already explained to you.
In addition, you may consider the following factors: One, the witness's opportunity to view the person who committed the alleged offense; Two, the witness's degree of attention on the perpetrator when she observed the crime being committed; Three, the accuracy of any description the witness gave prior to identifying the perpetrator; Four, the degree of certainty expressed by the witness in making any identification; Five, the length of time between the witness's observations of the offense and the first identification; Six, discrepancies or inconsistencies between identifications if any; Seven, the circumstances under which any out of Court identification was made. Here, the testimony was that a photo array was presented to [Tynetta] Kareem; Eight, any other factors based upon the evidence or lack of evidence from this case which you consider relevant to your determination whether the identifications were reliabl[e].
If after considering all the evidence you determine the State has not proven beyond a reasonable doubt that the defendant was the person who committed these offenses, then you must find the defendant not guilty. If on the other hand after consideration of all the evidence you're convinced beyond a reasonable doubt that the defendant was correctly identified, you will then consider whether the State has proven each and every element of the offenses charged beyond a reasonable doubt.
[7] We use this citation because the opinion has been amended and is incorrect in the Atlantic volume.
[8] In the absence of a request for such a charge or any objection to the charge on this basis, we do not hold that reversal is warranted on this basis or as a result of the jury charge.
[9] Hamlet, whose photo was not included in the array, was apparently "No Billed" on the charge.
[10] We need not decide whether defense counsel's reference to "shackles" included more than handcuffs as Artwell's reference to "physical restraint" encompasses handcuffs, shackles or both. See Artwell, supra, 177 N.J. at 537, 832 A.2d 295.
[11] At the remand hearing, the prosecutor disputed this, stating "[s]o when that transcript says he was led in I do recall he wasn't led in, he was already on the witness stand when the jurors were brought out." However, the record does not support that recollection. See footnote 4, supra, at 357, 915 A.2d at 595.
[12] In 1987, we found harmless error when a defendant appeared in prison garb during trial. State v. Carrion-Collazo, 221 N.J.Super. 103, 111, 534 A.2d 21 (App.Div.1987), certif. denied, 110 N.J. 171, 540 A.2d 171 (1988). See also State v. Herrera, 385 N.J.Super. 486, 494-500, 897 A.2d 1085 (App.Div.2006); State v. Russell, supra, 384 N.J.Super. at 597, 895 A.2d 1163. As noted, the portion of Artwell dealing with prison garb does not apply to this case, tried in January 2002, as Artwell was announced in 2003 and declared prospective only. See Artwell, supra, 177 N.J. at 526, 530, 832 A.2d 295.