937 A.2d 988 (2008)
397 N.J. Super. 398
STATE of New Jersey, Plaintiff-Respondent,
v.
Larry R. HENDERSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 13, 2007.
Decided January 7, 2008.
*989 Yvonne Smith Segars, Public Defender, attorney for appellant (Robert Carter Pierce, Designated Counsel, on the brief).
Joshua M. Ottenberg, Special Deputy Attorney General, Acting Camden County Prosecutor, attorney for respondent (Laurie A. Corson, Special Deputy Attorney General, Acting Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges STERN, C.S. FISHER and C.L. MINIMAN.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider, among other things, the trial judge's denial of defendant's motion to suppress an out-of-court identification. Because the Attorney General's "Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures" (the Guidelines)[1] were materially breached by the investigating officers' intrusion into an eyewitness's examination of a photographic array, we conclude that a presumption of impermissible suggestiveness must be imposed, and a new Wade[2] hearing conducted.

I
The jury heard testimony that in the early morning hours of January 1, 2003, Rodney Harper and James Womble were smoking crack cocaine at Womble's apartment on Kaighn Avenue in Camden. At approximately 2:45 a.m., there was a knock at the door, which Womble answered. At *990 the door were two men, one of whom was co-defendant Gregory Clark, known in the neighborhood as "Bubbles." Womble later identified defendant as the other.
According to Womble, defendant pointed a gun at him, saying, "[d]on't move, you're not involved." Clark, according to Womble, went into another room and began arguing with Harper about money. Womble heard Harper say, "do what you gotta do," following which Womble heard a gunshot. Womble testified that he entered the other room, where Harper sat bleeding from the chest; Clark was still present. Womble offered to get the money that Harper apparently owed to Clark, and pleaded with Clark not to shoot Harper again. Defendant and Clark departed, and, according to Womble, Clark said to him as he left: "[d]on't rat me out, I know where you live."

II
Defendant was charged, along with co-defendant Clark,[3] with the first-degree murder of Harper on January 1, 2003, N.J.S.A. 2C:11-3(a)(1) and (2), as well as: second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree being a person not entitled to possess a weapon, N.J.S.A. 2C:39-7(b).
Defendant moved to suppress a statement he gave to the police after he was arrested on January 17, 2003. Following a hearing, this motion was denied. The trial judge also conducted a Wade hearing and determined that evidence of Womble's out-of-court identification of defendant was admissible.
At the conclusion of the trial, defendant was acquitted of murder and aggravated manslaughter, but convicted of second-degree reckless manslaughter and the other remaining charges. Following all appropriate mergers, the trial judge sentenced defendant to: a seven-year prison term, with an 85% period of parole ineligibility, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the reckless manslaughter conviction; a four-year prison term on the unlawful possession of a weapon conviction to run consecutively to the term imposed on the manslaughter conviction; and a nine-month prison term on the persons not permitted to be in possession of a weapon conviction, to run concurrently with the other weapon conviction.
Defendant appealed. In the brief filed by his appellate counsel, defendant raised the following arguments:
I. THE TRIAL COURT ERRED BY DENYING [DEFENDANT'S] MOTION TO SUPPRESS HIS STATEMENT, BECAUSE HIS WAIVER OF HIS RIGHT TO REMAIN SILENT WAS NOT KNOWING AND INTELLIGENT DUE TO THE STATE'S FAILURE TO INFORM HIM THAT A WARRANT FOR THE MURDER OF RODNEY HARPER HAD BEEN ISSUED AGAINST HIM.
II. THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY, SUA SPONTE, WITH SELF-DEFENSE (Not Raised Below).
III. THE TRIAL COURT ERRED BY DENYING [DEFENDANT'S] MOTION TO SUPPRESS THE EYEWITNESS' IDENTIFICATION, BECAUSE THE PRE-TRIAL IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE, *991 WHICH CAUSED A SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.
IV. THE SENTENCE IMPOSED UPON [DEFENDANT] IS EXCESSIVE.
Defendant also filed a pro se brief in which he raised the following arguments, which we have renumbered:
V. DEFENDANT CONTENDS THE STATE VIOLATED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT[S] AND COMMITTED PREJUDICIAL ERROR BY DENYING HIM [THE] RIGHT TO CONFRONT WITNESSES AGAINST HIM . . . WHICH CREATED [OR] RESULTED IN UNDUE PREJUDICE AGAINST HIM.
VI. DEFENDANT CONTENDS THE STATE VIOLATED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT[S] BY NOT ALLOWING RELIEF FROM PREJUDICIAL JOINDER IN WHICH CO-DEFENDANT['S] STATEMENT WAS INADMISSIBLE IN [THE] JOINT TRIAL VIOLATING DEFENDANT['S] RIGHT TO FAIR TRIAL.
VII. DEFENDANT CONTENDS THAT THE STATE COMMITTED PROSECUTOR[IAL] MISCONDUCT BY POINTING AND CALLING [DEFENDANT] A LIAR IN [THE] PROSECUTOR['S] SUMMATION TO THE JURY IN WHICH THERE WAS NO EVIDENCE . . . TO [SUPPORT] THIS BASELESS ACCUSATION VIOLATING DEFENDANT['S] RIGHT TO A FAIR TRIAL (Not Raised Below).
VIII. THE TRIAL COURT ERRED BY DENYING DEFENDANT ANY MITIGATING FACTORS THAT [WERE] SUPPORTED BY [THE] RECORD IN DETERMINING HIS SENTENCE . . . WHICH WOULD HAVE [GIVEN HIM] A LOWER SENTENCE IN THE RANGE (Not Raised Below).
We find insufficient merit in the arguments contained in Points II, IV, V, VI, VII and VIII to warrant discussion in a written opinion. R. 2:11-3(e)(2).
For the reasons, to which we hereafter turn, we reject the argument contained in Point I. We do, however, agree with the thrust of Point III and, accordingly, will remand for further proceedings regarding Womble's out-of-court and in-court identifications of defendant.

III
According to findings made by the trial judge at a hearing, upon being taken into custody, defendant was told by an officer that the police had a warrant for his arrest and that they were taking him to the homicide unit of the prosecutor's office. In response, defendant said, "I know what it's all about. I've been waiting for this to happen." Defendant thereafter waived his Miranda[4] rights and gave the police a statement that was used against him at trial.
Defendant argues that he did not knowingly waive his right to remain silent when interrogated because he was not specifically informed that a warrant for his arrest for the murder of Harper had been issued. He cites in support the Supreme Court's decision in State v. A.G.D., 178 N.J. 56, 835 A.2d 291 (2003). There, the Court held that a basic requirement of an accused's knowing and voluntary waiver of Miranda rights is the right to be informed that a criminal complaint or arrest warrant has issued. Id. at 68-69, 835 A.2d 291. *992 However, the facts of A.G.D. are quite different from the circumstances presented here.
In A.G.D., an arrest warrant had issued but when the police approached the defendant he was not told that; he was only told that the police wanted to discuss with him certain allegations of sexual abuse. The defendant agreed to accompany the officers to the prosecutor's office, where he was informed of and waived his Miranda rights. Only after he made incriminating statements, did the police inform the defendant in A.G.D. about the arrest warrant. Id. at 60, 835 A.2d 291. The Court held that the defendant had been "disadvantaged by a lack of critically important information," explaining that "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." Id. at 68, 835 A.2d 291.
Here, the police advised defendant that they had a warrant for his arrest and told him that he was being taken to the homicide unit. Although the police did not tell defendant that he had been arrested for the murder of Harper, defendant responded that he knew "what it's all about." Accordingly, unlike what occurred in A.G.D., defendant was not disadvantaged. He knew he was being arrested and, thus, his waiver of his Miranda rights was fully informed. We decline the invitation to hold that the principles announced in A.G.D. extend to also informing an accused of the basis for the arrest warrant, particularly, as here, when defendant well-understood why he was arrested.
Because the trial judge's findings at the Miranda hearing were fully supported by credible evidence and are entitled to our deference, State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999), and because those facts support the judge's determination that defendant was adequately informed of his status when he waived his Miranda rights, we reject defendant's argument that his incriminating statements should have been suppressed.

IV

A
When Harper died on January 10, 2003, the investigation was turned over to Investigator Randy McNair and Detective Luis Ruiz. Their investigation led them to speak to Womble, who initially advised that he was inside the Kaighn Avenue apartment when he heard two gunshots outside. He stated that, after hearing the gunshots, he went outside to find Harper, who told him he had been shot by two unknown persons. He later claimed he gave this false version because he was concerned that his involvement could endanger his elderly father.
According to testimony adduced at a Wade hearing, the next day the investigating officers re-interviewed Womble and confronted him with certain inconsistencies in his story. Womble became upset and said he would tell the truth. He advised that the man who shot Harper was known as "Bubbles," and he indicated where "Bubbles" lived. A database search of this address generated a photograph of co-defendant Clark, who Womble positively identified as "Bubbles."
Womble subsequently gave the police another statement, indicating that the shooting occurred in the Kaighn Avenue apartment, and that he retrieved from the floor a shell casing, which he later threw into the street. The police stopped the interview and had Womble show him where he had discarded the shell casing. Womble took the police to the intersection *993 of Louis and Everett Street, approximately five blocks from the Kaighn Avenue apartment, where the shell casing was found.
Based on Womble's identification of Clark as the man who shot Harper, a warrant was issued for Clark's arrest. After waiving his Miranda rights, Clark claimed that Harper had pointed a gun at him and that, in the ensuing struggle, Harper was shot with his own weapon. Upon further interrogation, Clark identified defendant as the other gunman.
Investigator McNair then arranged for Womble to view a photographic array. In conformity with that part of the Attorney General's Guidelines that requires, whenever possible, that the photographic identification procedure be conducted by an officer other than the primary investigator, Officer Weber was called in to present to Womble an array of eight photographs. This array included a photograph of defendant. Womble immediately excluded five of the photographs. He more carefully examined the other three, but was only able to eliminate one, stating he was not 100% sure about the other two. Officer Weber left the room to report to the investigating officers.
In response to Womble's inability to select defendant's photograph from the array, Investigator McNair and Detective Ruiz entered the room and spoke with Womble. Officer Weber was not then present. McNair testified at the Wade hearing that he felt Womble was "holding back from us," and so he and Ruiz "wanted to go in and to clarify and be clear on what he was saying to us." He also testified that Womble was concerned about the safety of his elderly father because the second gunman was still at large. McNair testified that, in order to put Womble's mind at ease, he "told him to focus, to calm down, to relax and that any type of protection that [he] would need, any threats against [him] would be put to rest by the Police Department." Womble then responded that he could make an identification. With that, McNair and Ruiz left the room.
Officer Weber re-entered the room and again showed Womble the array. This time, according to Weber, Womble "slammed his hand down on the table and said, `[t]hat's the mother fucker there,'" thus positively identifying defendant as one of the men involved in the shooting of Harper.
At the Wade hearing, Womble testified that the intervening discussion was much as described by McNair. However, he also testified that he "felt" that a Spanish officer  who he identified at the hearing as Weber  was "nudging" him toward selecting defendant's photograph by the way he was moving the photographs around.
After hearing this testimony, the trial judge concluded that defendant failed to demonstrate that the procedure was impermissibly suggestive or that the identification was unreliable.

B
The due process guarantees of our federal and state constitutions, at their very core, require a criminal justice system designed to generate reliable determinations. As a result, it has long been understood that due process concepts prohibit the use of identification evidence produced by events that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968), because, ultimately, a conviction that rests "on a mistaken identification" constitutes "a gross miscarriage of justice," Stovall v. Denno, 388 U.S. 293, *994 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1204 (1967).
The "vagaries of eyewitness identification," as explained by Justice Brennan in his opinion for the Court in Wade, are "well-known," and "the annals of criminal law are rife with instances of mistaken identification." 388 U.S. at 228, 87 S.Ct. at 1933, 18 L.Ed.2d at 1158. "A major factor" contributing to mistaken identification has been "the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." Ibid.
Our Supreme Court has followed a two-step analysis developed by the Supreme Court of the United States. In a series of cases dealing with showups, starting with the United States v. Wade and Stovall v. Denno decisions it rendered the same day in 1967, the Supreme Court crafted a "totality of the circumstances" test as the means for guarding against potentially misleading identification evidence.
In Stovall v. Denno, supra, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the Court considered the suggestiveness of a handcuffed defendant being brought to a hospital room to be viewed by a gravely-injured victim. The Court held that this process was not "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny the defendant due process of law, but was necessary because the only person who could exonerate the defendant was in the hospital, the hospital was not far from the jail, and no one knew how long the victim would live. Id. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206.
In 1972, the Court considered whether a showup different from that considered in Stovall v. Denno was unnecessarily suggestive and whether that fact alone warranted exclusion of identification evidence. In Neil v. Biggers, 409 U.S. 188, 198-99, 93 S.Ct. 375, 382-83, 34 L.Ed.2d 401, 411-12 (1972), the station house showup occurred seven months after the crime, unlike the exigent circumstances presented in Stovall v. Denno. The Court in Neil v. Biggers held that this lapse of time "would be a seriously negative factor in most cases," 409 U.S. at 201, 93 S.Ct. at 383, 34 L.Ed.2d at 412, but that the test remained "whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive," id. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
And, in seeking to resolve the nagging uncertainty in the lower courts about the application of the "totality of the circumstances" test since Neil v. Biggers was decided, the Court emphasized in Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977), that "reliability is the linchpin." The Court held that the factors to be considered in ascertaining the reliability of an identification  "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation"  had to be weighed against "the corrupting effect of the suggestive identification itself." Ibid. This remains the test required by the Court's interpretation of the federal constitution.
Our Supreme Court has repeatedly adhered to this two-step analysis, see, e.g., State v. Herrera, supra, 187 N.J. at 504, 902 A.2d 177; State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988), although it has recently evinced a willingness to look further into its ability to preclude mistaken identifications. For example, in State v. Herrera, supra, 187 N.J. at 500, 902 A.2d 177, the Court was asked to depart from the thirty-year-old rule in Manson v. *995 Brathwaite and hold that the state constitution imposed more stringent limits on the use of identification evidence obtained from a non-exigent showup. The defendant in State v. Herrera urged that the Court confine "the use of showups to circumstances where they are absolutely necessary and are conducted in a fair manner." 187 N.J. at 500, 902 A.2d 177.
In State v. Herrera, the victim was seated in his car waiting for traffic to pass when approached by a man on a bicycle who asked for money and then assaulted him. When the victim regained consciousness, his car was gone. The defendant was apprehended, and the police brought the victim to a hospital emergency room where the defendant was present; he entered the emergency room, looked around, and identified the defendant, who was seated on a hospital bed six feet away. Id. at 497, 902 A.2d 177. The only other persons in the room were police officers and nurses. Ibid. The defendant argued that "the fallibility of eyewitness identifications cannot be ignored and that current studies of post-conviction DNA exonerations show that a large majority of those wrongful convictions involved eyewitness error." Id. at 499, 902 A.2d 177. In considering whether to adopt a standard that would bar the use of evidence of an out-of-court identification resulting from a non-exigent showup, the Court recognized that other states have deviated from the Supreme Court's federal jurisprudence regarding showup identifications. Id. at 500-01, 902 A.2d 177. The Court, however, observed that the defendant had failed to present this "scientific evidence" until the matter was on appeal, id. at 501, 902 A.2d 177, and concluded that "[u]ntil . . . convinced that a different approach is required after a proper record has been made in the trial court," it would continue to adhere to the federal standard, id. at 504, 902 A.2d 177.
State v. Delgado, 188 N.J. 48, 902 A.2d 888 (2006) may portend a more expansive view of the state constitution than the approach adhered to in State v. Herrera the term before. In State v. Delgado, the Court considered the reliability of the results of a police lineup. In exercising its supervisory powers, N.J. Const. art. VI, § 2, ¶ 3, the Court required "as a condition to the admissibility of an out-of-court identification" that law enforcement personnel "make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results." State v. Delgado, supra, 188 N.J. at 63, 902 A.2d 888.
Although perhaps signaling a future alteration of the legal landscape,[5]State v. Herrera and State v. Delgado hold that our courts remain obligated to apply the federal two-step analysis, which, as we have said, requires that the court first ascertain whether the identification procedure was "impermissibly suggestive," State v. Herrera, supra, 187 N.J. at 503, 902 A.2d 177, and, if so, "whether the objectionable procedure resulted in a `very substantial likelihood of irreparable misidentification,'" State v. Madison, supra, 109 N.J. at 232, 536 A.2d 254 (quoting Simmons v. United States, supra, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253). We conclude that the trial judge erroneously determined that the procedure was not impermissibly *996 suggestive based largely on the investigating officers' breach of the Guidelines.

C
In 2001, the Attorney General developed and adopted the Guidelines in order to improve police procedures. The Attorney General recognized, in the Guidelines' preamble, that "case law and recent studies have called into question the accuracy of some eyewitness identifications." Herrera, supra, 187 N.J. at 515, 902 A.2d 177.[6]
Section IA of the Guidelines requires that "whenever practical" the person conducting the photographic identification procedure "should be someone other than the primary investigator assigned to the case." Id. at 516, 902 A.2d 177. This particular provision results from the Attorney General's concern that an officer familiar with the facts of the investigation could inadvertently signal a "correct" response to the witness. Ibid.[7]
Officer Weber, who was not involved in the investigation, was brought in for the very purpose of avoiding the type of suggestiveness that could result from an investigating officer's involvement in the identification procedure. However, when the process conducted by Officer Weber failed to produce a positive identification, the investigating officers intruded and, following a brief discussion with Womble outside the presence of Officer Weber, Womble was suddenly able to emphatically select defendant's photograph from the array. Although the Guidelines do not expressly state that an investigating officer may not intrude into the process, such conduct certainly violates the spirit of the Guidelines in this case.

D
Because the Guidelines were breached  and in a material way  the disposition of this appeal turns on the remedy warranted by that improper conduct.
"The judicial branch has an overarching constitutional responsibility to guarantee the proper administration of justice, and particularly, the administration of criminal justice." State v. Williams, 93 N.J. 39, 62-63, 459 A.2d 641 (1983). As a result, judges possess inherent power to guarantee the fairness of criminal proceedings. State v. Maisonet, 166 N.J. 9, 23, 763 A.2d 1254 (2001); State v. Abbati, 99 N.J. 418, 428, 493 A.2d 513 (1985). Case law suggests a variety of ways that a court may address missteps in pretrial investigative proceedings, including the granting of a dismissal of an indictment, the imposition of a presumption of impermissible suggestiveness, and the rendering of jury instructions detailing the improper police conduct.
Our decision in State v. Peterkin, 226 N.J.Super. 25, 543 A.2d 466 (App.Div.), certif. denied, 114 N.J. 295, 554 A.2d 850 (1988) is helpful in considering the broad range of potential remedies. There, a police officer's negligent misplacement of photographic arrays was followed by the officer's "brazen and lawless" attempts to cover-up his negligent conduct. Id. at 37 543 A.2d 466. Because there was "no *997 evidence in the record suggestive of bad faith or connivance on the part of the police in failing to preserve the photographic arrays," id. at 42, 543 A.2d 466, just in the cover-up, we held that dismissal of the indictment was too draconian, id. at 38-39, 543 A.2d 466. Dismissal of an indictment should be ordered only on "the clearest and plainest ground," State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952) (internal quotes omitted), and not unless the defendant's right to a fair trial has been "irretrievably lost because of the police misconduct . . .," Peterkin, supra, 226 N.J.Super. at 39, 543 A.2d 466. However, in Peterkin, we also determined that the out-of-court identification could not "reasonably be constructed by testimony," and, therefore, upheld the trial judge's suppression of the photographic identification. Id. at 43, 543 A.2d 466. And, with regard to the State's utilization of an in-court identification of defendant by the same witness, we remanded for a hearing at which the State would be required to demonstrate, by clear and convincing evidence, that the in-court identification was generated by sources independent of the defective out-of-court identification. Id. at 45, 543 A.2d 466. As to whether the negligent loss of the photographic arrays warranted a presumption that the process was "impermissibly suggestive," as held in cases such as Branch v. Estelle, 631 F.2d 1229, 1234 (5th Cir.1980) and United States v. Sonderup, 639 F.2d 294, 298-99 (5th Cir.), cert. denied sub nom., Sonderup v. United States, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 426 (1981), we held that it was not necessary to adopt "an ironclad rule," Peterkin, supra, 226 N.J.Super. at 41, 543 A.2d 466.
More recently, we considered a circumstance where the police could not locate the original photographic array but had retained a photocopy. State v. King, 390 N.J.Super. 344, 358-61, 915 A.2d 587 (App. Div.), certif. denied, 190 N.J. 394, 921 A.2d 448 (2007). We observed that the trial judge had applied the "totality of the circumstances" test, and, in examining the photocopy of the array found no basis for exclusion of either the out-of-court identification or in-court identification. Id. at 360, 915 A.2d 587. However, in King, we also examined the trial judge's jury charge and concluded that the defendant was entitled to more detailed instructions relating to "the contested facts relevant to the claim of suggestiveness." Id. at 361, 915 A.2d 587. We relied upon State v. Ledbetter, 275 Conn. 534, 881 A.2d 290, 318 (Conn.2005), cert. denied sub nom., Ledbetter v. Connecticut, 547 U.S. 1082, 126 S.Ct. 1798, 164 L.Ed.2d 537 (2006), where the witness was not told "that the perpetrator may or may not be present" in the array, as required. The Connecticut Supreme Court held that the defendant was entitled to have the jury charged on that failure and its tendency to increase the probability of a misidentification. Ibid. In light of the misplaced photo array in King, we held that a charge similar to that described in Ledbetter was warranted. 390 N.J.Super. at 362-63, 915 A.2d 587.
These cases suggest the types of remedies that may be imposed. However, we must also be mindful that these same cases dealt with the negligent loss of a photographic array. Here, unlike the facts in Peterkin and King, the police purposefully contravened the Guidelines; there has been no suggestion, nor could there be, that the police accidentally or negligently encountered Womble during his examination of the photographic array. The facts permit only one conclusion: the investigating officers consciously and deliberately intruded into the process for the purpose of assisting or influencing Womble's identification of defendant. As a result, we conclude that these circumstances must generate *998 a presumption that the procedure was impermissibly suggestive.[8] Any lesser remedy would eviscerate the Guidelines and encourage law enforcement officials to engage in the type of charade that occurred here.[9]
Consequently, we find that the trial judge's determination that the procedure was not impermissibly suggestive cannot stand. We substitute for that finding a presumption that the procedure was impermissibly suggestive, and we remand for a determination of the second prong of the "totality of the circumstances" test. As to this latter point, we recognize that the trial judge has already held that the identification was reliable. However, the judge made that determination at the same time he declared that the procedure was not impermissibly suggestive. As held in Manson v. Brathwaite, evidence relating to the reliability of the identification must be weighed against "the corrupting effect of the suggestive identification itself." 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Because the trial judge did not find or appreciate the impermissible suggestiveness of the process, he never weighed that evidence against the corrupting nature of the process. Defendant is entitled to have the evidence reassessed through application of the proper framework.
Our holding that this particular breach of the Guidelines warrants a presumption of impermissible suggestiveness is informed by the fact that eyewitness testimony plays an influential role in many criminal prosecutions. This fact requires a deeper concern about suggestive procedures because, as our Supreme Court has observed, empirical studies now suggest that juries "tend to place great weight on eyewitness identifications, often ignoring other exculpatory evidence," State v. Cromedy, 158 N.J. 112, 121, 727 A.2d 457 (1999), and because the degree to which a witness expresses confidence in an identification tends also to be unduly valued by juries, see Herrera, supra, 187 N.J. at 524, 902 A.2d 177 (Albin, J., dissenting) (citing Elizabeth F. Loftus & James M. Doyle, Eyewitness Testimony: Civil and Criminal 141 (3d ed.1997), and 2 Wayne R. LaFave et al., Criminal Procedure § 7.4(c) at 675 (2d ed.1999)); see also Jessica Lee, Note, No Exigency, No Consent: Protecting Innocent Suspects From the Consequences of Non-Exigent Show-Ups, 36 Colum. Hum. Rts. L.Rev. 755, 772-74 (2005). As recently summarized by our Supreme Court, "[e]yewitness identification can be the most powerful evidence presented at trial, but it can be the most dangerous too," causing the Court to conclude that misidentification is now "the single greatest cause of wrongful convictions in this country." Delgado, supra, 188 N.J. at 60, 902 A.2d 888. See also Timothy P. O'Toole & Giovanna Shay, Manson v. Brathwaite Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Procedures, 41 Val. U.L.Rev. 109 *999 (2006); Samuel R. Gross et al., Exonerations in the United States 1989 Through 2003, 95 J.Crim. L. & Criminology 523 (2005); Daniel S. Medwed, Anatomy of a Wrongful Conviction: Theoretical Implications and Practical Solutions, 51 Vill. L.Rev. 337 (2006); Ruth Yacona, Comment, Manson v. Brathwaite: The Supreme Court's Misunderstanding of Eyewitness Identification, 39 J. Marshall L.Rev. 539 (2006). As a result, our courts are obligated to utilize great care in the application of the governing principles in order to prevent an accused from being convicted on the basis of unreliable eyewitness evidence.
We conclude that the trial judge's denial of defendant's motion to suppress evidence regarding Womble's out-of-court identification was erroneous.

V
Our holding has a number of consequences for the trial court's future disposition of this case.
First, in remanding for a new Wade hearing, we feel it necessary to direct that the matter be assigned to a different judge. In fairness to the trial judge, we think it a difficult and uncomfortable task for him to now revisit and re-evaluate the evidence in light of the opinion he has already expressed about that evidence.[10]See, e.g., State v. Gomez, 341 N.J.Super. 560, 579, 775 A.2d 645 (App.Div.) (holding that, on remand, "it is appropriate to have the case referred to a different trial judge who will be unfettered by comments on the record [by the original trial judge] which could be interpreted as an advance evidential ruling on admissibility"), certif. denied, 170 N.J. 86, 784 A.2d 719 (2001). See also N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 617, 512 A.2d 438 (1986); In re Guardianship of R.G. & F., 155 N.J.Super. 186, 195, 382 A.2d 654 (App.Div.1977).
Second, we recognize that this change will require a new evidentiary hearing, and not simply the utilization of the record previously created. A mere reading of the transcripts of the relevant testimony will not allow the new judge the opportunity to assess the witnesses' credibility. Any minor inconvenience to the witnesses and any added work for the trial court and the parties caused by our judgment is well worth the price of guaranteeing to defendant his right to a fair Wade hearing unfettered by previous mistaken findings.
Third, if the determinations made at the new Wade hearing require the exclusion of the out-of-court identification made by Womble, then the judge should also determine whether Womble is able to make an in-court identification of defendant from an independent source. See Peterkin, supra, 226 N.J.Super. at 45, 543 A.2d 466. The State bears the burden of demonstrating this by clear and convincing evidence. Ibid.
Fourth, if the Wade or taint hearings require the suppression of evidence then defendant is entitled to a new trial, but not otherwise. See State v. Herrera, 385 N.J.Super. 486, 500, 897 A.2d 1085 (App. Div.2006).
*1000 Reversed and remanded for proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] The Guidelines are appended to the Court's opinion in State v. Herrera, 187 N.J. 493, 511-20, 902 A.2d 177 (2006).
[2] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[3] Clark's appeal was calendared back-to-back with this appeal and has been decided by way of a separate opinion also filed today. Docket No. A-4193-04T4, 2008 WL 59972.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] In State v. Herrera, two members of the Court urged in dissent that "the time has come for this Court to set new standards that prohibit highly suggestive identification procedures" and to "announce that the use of unnecessarily suggestive identification procedures violates the due process guarantees of Article I, Paragraph 1 of the New Jersey Constitution." 187 N.J. at 521, 528, 902 A.2d 177 (Albin, J., dissenting).
[6] As the Court noted in Herrera, the Attorney General referred to a study of 1998 DNA exoneration cases, which revealed that "ninety percent of the cases analyzed involved one or more mistaken eyewitness identifications." 187 N.J. at 502 n. 2, 902 A.2d 177.
[7] We are mindful that the Guidelines recognize the possibility that personnel problems may at times preclude the conducting of a photographic array by an independent officer  a circumstance not present here.
[8] Similarly, in Herrera, the Court held that "the suggestiveness inherent in a showup" together with suggestive "comments by the police" during the showup that the apprehended person was the culprit, 187 N.J. at 506, 902 A.2d 177, which statement was inconsistent with the requirements of the Guidelines, id. at 506 n. 3, 902 A.2d 177, compelled a finding that the first prong of the totality of the circumstances test had been met.
[9] We offer no view as to whether other breaches of the Guidelines might not require the imposition of a presumption, but might be sufficiently remedied by a shifting of the burden of persuasion regarding the suggestiveness of the procedure to the State or in some other meaningful manner.
[10] For example, in his written decision, the judge stated that defendant not only failed "to meet his burden to prove by a preponderance of the evidence that the photo array identification procedure utilized in this case was impermissibly suggestive," but that "the State has proven by clear and convincing credible evidence  indeed by credible evidence beyond reasonable doubt, that the photo array identification procedure was not suggestive so as to result in a substantial likelihood of misidentification." In light of such a strong and mistaken opinion on the subject, we believe it is best that the matter be examined anew by a different judge.