# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2005-SC-000708-MR

DATE 9-11-08 Ella Grout, D.C.

JAVON HEARN                                                           APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                              HONORABLE MARTIN F. MCDONALD, JUDGE
NO. 02-CR-001962-001

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

I. <u>INTRODUCTION</u>

This is a matter of right appeal from a judgment in which Appellant Javon Hearn was convicted of Murder, First Degree Robbery, and Tampering with Physical Evidence. Appellant makes the following arguments on appeal: that different positions taken by the prosecution as to his co-defendant's truthfulness violated due process and fundamental fairness, the ethical duty of the prosecutor, and his right to present a defense; that the prosecutor's statements suggesting that defense counsel knew Appellant to be a liar should have resulted in a mistrial; and that a photo lineup, which resulted in a witness identifying Appellant, was unduly suggestive. For the following reasons, we reject Appellant's arguments, and affirm the judgment of the Jefferson Circuit Court.

## II. BACKGROUND

On August 27, 2002, in Jefferson County, Kentucky, Kiphart, Jr. (Kiphart) returned a movie to a Blockbuster Video at approximately noon. Though there is some factual dispute as to what happened next, Kiphart apparently met with Appellant, at a Bigfoot convenience store. About an hour later, at approximately 1 p.m., a worker at Green Meadows Cemetery discovered Kiphart's body. Kiphart had been shot once in the lower back, and three times in the back of the head.

Appellant's half brother, Gary Hearn, gave the police two statements implicating Appellant. Gary claimed that, the day of the murder, he was in the Shagbark area near Green Meadows Cemetery. Gary did not explain why he was in the Shagbark area, aside from saying, "That's where I hang at." Gary also admitted that he "circled around" the cemetery, but he denied seeing Kiphart's body, despite the fact that the body was in plain view. Witnesses stated that a maroon (or similarly colored) SUV and a green Buick sped in and out of the cemetery. The Buick was later identified as belonging to Gary Hearn.

Gary claimed that he saw Appellant driving Kiphart's car. Gary's original statement suggested that this was a random encounter with his brother. Gary asked Appellant why he was driving Kiphart's car. Kiphart's car was well-known in the neighborhood because of its speakers, stereo system, and expensive rims.

According to Gary's statement, Appellant had encountered Kiphart around noon. Because Appellant wanted to steal Kiphart's car, Appellant asked Kiphart to take him to the cemetery to pick up some drugs Appellant had hidden there. According to Gary, this was a ruse to get Kiphart alone. Appellant then pulled a gun on Kiphart and

2

accidentally shot him once in the lower back. Wanting to avoid an attempted murder charge, Appellant then shot Kiphart three times in the back of the head.

Kiphart's car was soon located in an apartment complex parking lot. The car was missing its rims, stereo, speakers, and personal items such as Kiphart's compact discs and cell phone. According to Gary, Appellant had suggested that they strip the car, after which Appellant gave Gary the stereo, CDs, and cell phone, and asked Gary to hold them. Several days after the murder, apartment complex resident Luis Baez identified Appellant—but not Gary—as one of the men stripping Kiphart's car.

On August 30, police stopped and arrested Gary in his car. He was in possession of Kiphart's stereo and personal items at that time. Gary then gave police the statements previously mentioned. The Commonwealth was suspicious of Gary's story, particularly because he denied seeing the body, which was in plain view, and because he claimed to have randomly encountered Appellant shortly after the murder. The Commonwealth also considered Gary a suspect because he had Kiphart's stereo and personal items in his car when police arrested him.

On September 3, Appellant learned that he was also a suspect in Kiphart's murder, and turned himself in to the Louisville Police Department. Appellant waived his Miranda rights and agreed to speak with Detective Mark Fulmore. Appellant initially denied knowing Kiphart, but later said he had previously spoken to Kiphart about his car.[1] Appellant told police that, on the day Kiphart was killed, he had slept until 3:30 p.m., had played video games with his little brother, had called his girlfriend's mother to drive him to his girlfriend's home, and had gone to bed at his girlfriend's home at 8:30

---

[1] Gary was apparently better acquainted with Kiphart than Appellant was.

p.m. Appellant's girlfriend, however, denied seeing Appellant on August 27. No other person verified Appellant's story.

Though police did not know whether Appellant had been at the Bigfoot on August 27, Detective Fulmore told Appellant that the police had him on video tape at the Bigfoot. Appellant responded, "What can I say, if you got it." Appellant made further incriminating statements, including mentioning the removal of the tires from Kiphart's car when Fulmore had not mentioned this fact to him. Appellant eventually told Fulmore, "You got me there; I should have asked for a lawyer."

The Commonwealth charged both Gary and Appellant with Kiphart's murder. Though the two men were originally to be tried together, the trials were ultimately severed. Gary was the first to be tried. Further facts, relevant to Appellant's individual arguments, are discussed below.

### III. ANALYSIS

Appellant raises three arguments on appeal. Appellant argues (A) that the Commonwealth's different positions as to Gary's truthfulness violated Appellant's rights, violated the prosecutor's ethical duty, and should have been admitted as evidence; (B) that the Commonwealth's statements about defense counsel's ethical duty not to present false testimony should have resulted in a mistrial; and (C) that a photo lineup was unduly suggestive.

### A. Different Theories by the Prosecution

During Gary's trial, the Commonwealth's theory was that both Gary and Appellant were involved in Kiphart's murder. The Commonwealth charged Gary with Murder on a theory of complicity. The Commonwealth argued that Gary was involved in the murder, but that he may not have been the person who killed Kiphart. During the

Commonwealth's opening statement in Gary's trial, the prosecutor told the jury, "You may or may not be convinced at the end of the case as to who specifically was the triggerman." During the Commonwealth's closing argument, the prosecutor also stated the following:

> Ladies and gentlemen, let's get this very clear. This crime was not a one-person crime; it is obvious that more than one person is involved in this crime. Gary's one of them. Clearly Javon's one of them . . . . This is a complicity case . . . . Just because one person doesn't pull the trigger doesn't mean that person is not guilty of a murder.

Because a conviction depended upon the jury not believing Gary's story, the Commonwealth sought to portray Gary as a liar. In his closing argument in Gary's trial, the prosecutor elaborated extensively on why Gary was untrustworthy:

> Gary lies and he lies a lot. He lies when he thinks he can get away with it and he tells the truth when he feels like he has to. . . . These words are very important, the lies and what is missing are extremely important. An innocent person doesn't lie about this stuff. . . . I can't stress this enough, he lied continually. Innocent people don't lie. They tell you the truth. The truth sets an innocent person free.

The jury apparently agreed with the Commonwealth's assessment of Gary's credibility. However, the jury did not convict Gary of Murder. Instead, the jury found Gary guilty of Facilitation to Murder, First Degree Robbery, and Tampering with Physical Evidence.

The trial court sentenced Gary to five years imprisonment for Facilitation to Murder, and five years imprisonment for Tampering with Physical Evidence, with the two sentences running consecutively for a total of ten years. Gary was not sentenced, however, for Robbery. Instead, Gary entered into an agreement with the Commonwealth, whereby he agreed to give the Commonwealth a new statement and to testify truthfully at Appellant's trial. In exchange for Gary's cooperation, Gary would be sentenced to ten years imprisonment for Robbery, with that sentence to run

5

concurrently with the other two sentences, for a total sentence of ten years. If Gary did not cooperate, he would be subject to the full range of possible sentences for Robbery.

Pursuant to the terms of the agreement, Gary provided the Commonwealth with a more complete statement than he had previously. Gary explained that he sold drugs, and that he regularly went to the Shagbark area "every day to really hang out" and sell drugs. This explained his encounter with Appellant, which Gary had previously portrayed as a chance encounter. In addition, Gary admitted that, after Appellant told Gary that he had killed Kiphart, Gary went to the cemetery to see the body. Gary explained that he had helped Appellant strip Kiphart's car, and that he had agreed to hold some of Kiphart's property for Appellant. Finally, Gary gave a more detailed account of his whereabouts the day of the murder, and of his subsequent conversations with Appellant.

Following this more complete statement, Gary testified against Appellant at his trial. At Appellant's trial, the Commonwealth's theory changed; the prosecution essentially presented Gary's version of events. The same prosecutor told the jury that Gary did not know what to think when Appellant told him that he had killed Kiphart. Gary eventually went to see Kiphart's body, and then Appellant gave Gary some of Kiphart's property to hold. The prosecutor told the jury that Appellant never had a chance to get the property back from Gary. The prosecutor explained that Gary denied involvement "at first," but that "it didn't take long for Gary to crack."

During Appellant's trial, the prosecutor also told the jury to watch Gary closely to see if his testimony is corroborated by the other evidence. The prosecutor asked the jury to decide whether Gary is telling the truth. He also told the jury, regarding Gary,

6

"We're convinced that you'll believe him." Throughout Appellant's trial, the Commonwealth portrayed Gary as truthful.

At Appellant's trial, the Commonwealth also informed the jury in its opening statement that Gary had been convicted of Facilitation to Murder, Tampering with Physical Evidence, and Robbery for his role in Kiphart's death. The Commonwealth further informed the jury that Gary still had his robbery conviction "hanging over his head," and that his sentence would depend upon his cooperation during the trial. The jury saw the agreement between Gary and the Commonwealth, which was admitted as evidence. The Commonwealth also conceded that Gary had initially lied to police. Over the course of Appellant's trial, the Commonwealth admitted the two statements Gary had made shortly after the murder, as well as the more complete statement Gary gave after his conviction.

During defense counsel's opening statement, Appellant's attorney argued extensively that Gary was a liar and untrustworthy. Defense counsel pointed out inconsistencies in the stories that Gary initially told police, including Gary's claim that he only pulled into the cemetery to make a U-turn. Defense counsel repeatedly referred to Gary as a "liar" and a "coward."

Several times during defense counsel's opening statement, Appellant's attorney attempted to tell the jury that the prosecutors had previously believed Gary to be involved in Kiphart's murder. The Commonwealth objected on the grounds that, if the prosecutor's thoughts and beliefs were put into issue, then those thoughts and beliefs would be evidence. The prosecutor did, however, offer to be a witness in Appellant's trial to testify as to the Commonwealth's thoughts and beliefs with regard to charging Gary. The trial court did not permit Appellant's attorney to discuss the thoughts or

7

beliefs of the prosecutors, but he was permitted to make the following statement in his opening:

> Mr. Bonar and Mr. Davis [the prosecutors] charged Gary Hearn with capital murder and robbery. They placed him on trial only six months ago in this very same courtroom. They put him on trial, and he faced the death sentence, and he was convicted. But now, they will bring him into this courtroom, place him on this witness stand, have him placed under oath, so he can sit there and tell his story to you.

Defense counsel also sought to introduce as evidence the prosecutor's statements from Gary's trial about Gary's truthfulness. The trial judge did not permit the introduction of these statements as evidence.

Gary testified to his version of events as a witness for the Commonwealth. On cross-examination, defense counsel questioned Gary extensively. Defense counsel asked Gary about statements he had made to the police, and Gary repeatedly admitted to lying in his earlier statements. For example, Gary initially told police that he obtained Kiphart's stereo from a man named Joe. Defense counsel also questioned Gary about the fact that, when the police arrested him, he was attempting to sell Kiphart's stereo.

Based partly on Gary's testimony, the jury found Appellant guilty of Murder, First Degree Robbery, and Tampering with Physical Evidence. The trial court sentenced Appellant to life imprisonment without parole for at least 25 years.

After Appellant's conviction, the Commonwealth, pursuant to CR 60.02, filed a motion to amend Gary's conviction. The Commonwealth asked the trial court to amend the First Degree Robbery conviction to Receiving Stolen Property over $300, and to amend the Facilitation to Murder conviction to Hindering Prosecution or Apprehension in the First Degree. The Commonwealth asked the court to preserve the Tampering with Physical Evidence conviction.

This motion went beyond the Commonwealth's obligation under the agreement it entered into with Gary prior to Appellant's trial. Under that agreement, the Commonwealth had only agreed to a concurrent sentence for Robbery. The Commonwealth did not discuss the CR 60.02 motion with Gary until after the conclusion of Appellant's trial. The motion contained the following language:

> This motion is not made lightly. Extraordinary facts and circumstances have prompted these actions, and only upon very careful consideration of those facts and circumstances does the Commonwealth make the present motion. . . . At the trial of Gary Hearn, the Commonwealth believed he played a larger roll [sic] in the murder and robbery of David Kiphart, Jr. However, that belief was based on incomplete information. . . . It was not until the complete facts surrounding the murder and robbery came to light that the Commonwealth was even in a position to imagine the possibility of this extraordinary request.

The trial court partially granted the motion. Upon oral motion of the Commonwealth, the court dismissed Gary's Robbery conviction. However, the court left the Facilitation to Murder and Tampering with Physical Evidence convictions intact for a total sentence of ten years.

Appellant claims the following with regard to the Commonwealth's differing theories: (1) that the differing theories violated Appellant's rights to due process and fundamental fairness, (2) that the Commonwealth's prosecutors violated their ethical duty by presenting conflicting theories, and (3) that the prosecutor's statements about Gary from Gary's trial should have been admitted as evidence in Appellant's trial.

### 1. Due Process and Fundamental Fairness

Appellant argues that the prosecution's use of inconsistent theories regarding Gary's involvement and Gary's truthfulness deprived Appellant of his due process right

to a fair trial.[2] We conclude that the Commonwealth did not violate Appellant's rights to due process and fundamental fairness when it changed its theory, for a combination of three reasons. First, the Commonwealth's theory in Gary's trial did not preclude the argument, and indeed suggested, that Appellant was also involved in the murder. Second, significant new information came to light after Gary's conviction but prior to Appellant's trial. This information provided a basis for the Commonwealth to change its theory regarding Gary's involvement. Finally, the Commonwealth acted in good faith and sought to correct its use of inconsistent theories by requesting that Gary's conviction be amended to reflect the Commonwealth's new theory of Gary's involvement.

This Court has never addressed the issue of whether a prosecutor's assertion of inconsistent positions against multiple defendants in separate trials violates a defendant's due process rights. However, other courts addressing the issue agree on certain basic principles.[3] To violate a defendant's due process rights, "an inconsistency must exist at the core of the prosecutor's case against defendants for the same crime."[4] In other words, when the prosecution changes its theory in order to convict multiple

---

[2] Appellant's argument is well-summarized by Judge Clark's concurrence in <u>Drake v. Kemp</u>: "[T]he prosecution's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories of the offense was inherently unfair. . . . The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth." 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring). For the reasons stated in this opinion, however, we do not believe that Appellant's case is analogous to <u>Drake</u>, or to any other case in which the prosecution's inconsistent theories rendered the defendant's conviction fundamentally unfair.

[3] <u>See generally</u> Kimberly J. Winbush, Annotation, *Judicial Estoppel in Criminal Prosecution*, 121 A.L.R. 5TH 551 (2004).

[4] <u>Smith v. Groose</u>, 295 F.3d 1045, 1052 (8th Cir. 2000).

10

defendants, and both defendants *could not have been convicted* had the prosecution used identical arguments, a due process violation has occurred.[5]

For example, in <u>Stumpf v. Mitchell</u>,[6] the prosecutor argued in two separate trials that two different defendants were each the one person who pulled the trigger, killing the victim.[7] The court found the prosecutor's arguments at the two trials to be "irreconcilably inconsistent."[8] As such, the court ruled that the irreconcilably inconsistent theories violated Stumpf's due process rights.[9]

Had the prosecutor in <u>Stumpf</u> used consistent theories against the two defendants, a jury could have only found that one man pulled the trigger. Instead, the prosecutor used irreconcilably inconsistent theories against two men in two trials to show that each was the *sole person* to pull the trigger.

A similar situation arose in <u>Smith v. Groose</u>.[10] In <u>Smith</u>, the owners of a home were killed in the course of a robbery.[11] One of the burglars gave two contradictory

---

[5] <u>United States v. Dickerson</u>, 248 F.3d 1036, 1043-44 (11th Cir. 2001) (distinguishing the case at bar from cases where a due process violation occurred based on the fact that, in those cases, "the Government . . . could not have prosecuted the remaining individual for the same crime had the Government maintained the theory or facts argued in the earlier trial."); <u>Stumpf v. Mitchell</u>, 367 F.3d 594, 612 (6th Cir. 2004), <u>rev'd sub nom. Bradshaw v. Stumpf</u>, 545 U.S. 175 (2005) (distinguishing <u>Nichols v. Scott</u>, 69 F.3d 1255 (5th Cir. 1995)) ("Therefore, [in <u>Nichols</u>,] the prosecutor's arguments were not factually inconsistent, because both defendants could have been convicted even if the prosecutor had used the identical argument in both cases.") (citing <u>Smith</u>, 205 F.3d at 1051).

[6] 367 F.3d 594. The United States Supreme Court reversed <u>Stumpf</u>. <u>Bradshaw v. Stumpf</u>, 545 U.S. 175 (2005). However, the Appellant argues that the Court "did not dispute the Sixth Circuit's general conclusion" with regard to the due process violation. The Commonwealth does not dispute this assertion, and it does seem clear that the Court's reversal of <u>Stumpf</u> was based largely on the fact that the defendant entered a guilty plea. <u>See</u> <u>Bradshaw v. Stumpf</u>, 545 U.S. at 186-87.

[7] <u>Stumpf</u>, 367 F.3d at 613. The United States Supreme Court also reversed <u>Stumpf</u> because it found that the relevant substantive law made the question of who pulled the trigger immaterial. <u>Bradshaw</u>, 545 U.S. at 184.

[8] <u>Stumpf</u>, 367 F.3d at 613

[9] <u>Id.</u> at 617.

[10] 205 F.3d 1045.

[11] <u>Id.</u> at 1047.

statements.[12] In the first statement, the burglar claimed that the defendant's group had left the house before the murder occurred, and blamed a cohort.[13] In the second statement, the burglar claimed that the defendant's group was in the house when the murder occurred.[14] The burglar testified to the first statement at trial, and the prosecutor used the second statement for impeachment.[15] The jury convicted the defendant of felony murder.[16] Then, at a later trial of the burglar's cohort, the prosecution relied on the burglar's first statement, *which the prosecution had previously impeached*, to convict the cohort of felony murder.[17]

Smith could have only been convicted of felony murder under one of the theories offered by the prosecution.[18] The burglar's two statements in Smith were irreconcilably inconsistent. The prosecutor, manipulating the evidence to gain two convictions when only one should have been possible, used the more favorable statement in each case in order to gain a conviction.

Unlike Stumpf, the Commonwealth never argued that Gary was the triggerman. During Gary's trial, the Commonwealth discussed the law of complicity in its opening statement and closing argument. During the opening statement, the prosecutor stated, "You may or may not be convinced at the end of the case as to who specifically was the triggerman." During the Commonwealth's closing argument, the prosecutor stated, "This crime was not a one-person crime. It is obvious that more than one person is

---

[12] Id. at 1047-48.

[13] Id. at 1047.

[14] Id. at 1047-48.

[15] Id. at 1048.

[16] Smith, 205 F.3d at 1048

[17] Id.

[18] Id. at 1051. ("In contrast to the situation in Nichols, the State's argument here is not factually consistent, nor could Smith have been convicted of felony murder under both theories.")

12

involved in this crime." The Commonwealth repeatedly theorized that others, including the Appellant, were also involved in Kiphart's murder. The jury, clearly agreeing that Gary was not the triggerman, and further believing that Gary was not intentionally complicit in the murder, convicted Gary of the lesser charge of Facilitation to Murder.

Unlike Smith, neither of the Commonwealth's theories precluded the possibility of involvement by the Appellant. In fact, during Gary's trial, the Commonwealth stated its belief that Appellant was also involved. The Commonwealth argued only that Gary was complicit in Kiphart's murder. Nothing in the Commonwealth's original theory about Gary's role in the crime would have prevented Appellant's prosecution had the Commonwealth's theory remained consistent. Unlike Stumpf, the Commonwealth did not seek to prosecute both Gary and Appellant for a crime of which one must be innocent. And unlike Smith, the Commonwealth did not present two theories, one of which must mean that Appellant is innocent.

The Commonwealth's change in theories is further explained by the existence of significant new information. The Appellant points to Thompson v. Calderon.[19] In Thompson, the prosecutor first argued at the defendant's trial that the defendant acted alone in killing the victim, and then argued at a co-defendant's trial that the two men acted together.[20] In the second trial, the prosecutor "discredited the very evidence he had previously offered."[21] A plurality of the Ninth Circuit, sitting en banc, concluded that Thompson was deprived of due process.[22]

---

[19] 120 F.3d 1045 (9th Cir. 1997), *vacated on other grounds*, 523 U.S. 538 (1998).
[20] Id. at 1059
[21] Id.
[22] Id.

The court's language in <u>Thompson</u> is significant: "[W]hen *no new significant evidence comes to light* a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime."[23] The <u>Stumpf</u> court further commented on this language, stating it agreed with this proposition "to the extent that it is meant to acknowledge a state's need to continue to investigate crimes and to present all available evidence in court."[24] In short, the prosecution may not present irreconcilably inconsistent theories in different trials, except when significant new evidence comes to light.

After Gary's conviction, Gary provided the Commonwealth with a more detailed explanation of the events that transpired the day of the murder. Gary filled in gaps in his story. He admitted that he had gone to the cemetery to view the body. Gary also explained that he sold drugs, and that he went to the Shagbark complex "every day to really hang out." The Commonwealth argues that "[t]he encounter with Javon [Appellant] became not chance, but a regularly expected event." We agree. Furthermore, Gary provided details of his conversations with Appellant after the murder. All of this new information had the effect of clearing up the confusion, and making Gary more credible. We believe that these new statements qualify as significant new information. This new information came to light in the time between Gary's trial and Appellant's trial. It explains why the Commonwealth would argue in Appellant's trial that Gary was a credible witness.

In addition, the Commonwealth was straightforward about its dealings with Gary. In the Commonwealth's opening statement against Appellant, the prosecutor informed the jury that Gary had been convicted for his role in Kiphart's death. The

---

[23] <u>Id.</u> at 1058 (emphasis added).
[24] 367 F.3d at 616.

14

Commonwealth disclosed exactly what Gary had been convicted of, and informed them that Gary's sentence for Robbery was dependent upon his cooperation in Appellant's trial. Furthermore, the Commonwealth introduced *all* of Gary's statements: the two made before his trial and the one made after. This is in contrast to the prosecution's conduct in Smith, where the prosecution withheld the witness' exculpatory statement, and only introduced the inculpatory one.[25] Such manipulation of the evidence is not present here.

Also, it seems clear that, following the new information arising from Gary's fuller statement, the Commonwealth no longer believed that Gary was directly involved in the murder. The Appellant argues that "the prosecutor said that despite his convictions, Gary Hearn was, in fact, innocent of robbery first degree and of facilitation to murder." This appears to be the case, based on the fact that the Commonwealth requested that the trial court amend Gary's Robbery conviction to Receiving Stolen Property over $300, and amend his Facilitation to Murder conviction to Hindering Prosecution or Apprehension. When the Commonwealth no longer believed that Gary participated in the murder, it took the extraordinary step of requesting that the trial court amend Gary's conviction to comport with what the Commonwealth now believed to be true. The Commonwealth should not be penalized for its efforts to ensure that Gary's convictions were in line with its new theory.

In Stumpf, the court was particularly concerned with the fact that, when new evidence came to light after the defendant's conviction, "the state had many opportunities to correct its use of conflicting theories," but did not do so.[26] Had the

---

[25] 205 F.3d at 1048.

[26] 368 F.3d at 616. See also Drake, 762 F.2d at 1479 (Clark, J., concurring) ("[If the prosecutor believed Campbell], then the prosecutor should not have prosecuted Campbell or, once he decided that he

Commonwealth successfully pursued a conviction against Gary for his involvement in the murder, and then subsequently argued at Appellant's trial that Gary was not involved, serious questions of fundamental fairness would be presented. But that is not the case here. When the Commonwealth, as a result of significant new information, no longer believed that Gary was directly involved in the murder, it corrected its use of conflicting theories by requesting that Gary's conviction be amended to reflect his actual involvement. This shows good faith on the part of the Commonwealth.[27]

Neither of the Commonwealth's theories of Gary's involvement precluded involvement by Appellant. In addition, significant new information came to the attention of the Commonwealth after Gary's trial, and the Commonwealth corrected its earlier version of events. Under these circumstances, Appellant's rights to due process and fundamental fairness were not violated.

### 2. Ethical Duty of the Prosecutor

Appellant argues that the prosecutor disregarded his "ethical function and duty to seek justice and truth" when he used inconsistent statements and theories regarding Gary's involvement and truthfulness. For many of the same reasons stated above, we conclude that the prosecutor did not disregard his ethical duty.

Prosecutors have a special role in the judicial system. Unlike other attorneys, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate."[28] The sovereign, represented in a criminal trial by the prosecutor, has an

---

believed Campbell's story (if this was after Campbell's trial), he should have taken steps to correct the error.").

[27] See In re Sakarias, 106 P.3d 931, 942 (Cal. 2005) ("[F]undamental fairness does not permit the People, *without a good faith justification*, to attribute to two defendants, in separate trials, a criminal act *only one defendant could have committed*.") (emphasis added).

[28] MODEL RULES OF PROF'L CONDUCT R. 3.8 cmt. 1.

16

interest "not that it shall win a case, but that justice shall be done."[29] The prosecutor "may strike hard blows, but he is not at liberty to strike foul ones."[30] In short, it is well established that the prosecutor has an ethical duty to act fairly and to seek conviction only when the facts support it.

We do not disagree with Appellant's arguments about a prosecutor's ethical duty. But the facts here do not support a conclusion that the prosecutor disregarded that duty. The Commonwealth's change in theory regarding Gary's involvement was supported by significant new information. Furthermore, the Commonwealth took significant steps to correct its use of inconsistent theories when it requested that the trial court amend Gary's sentence to comport with its new theory. At each trial, the prosecutors' arguments were supported by the facts then known to them.

Appellant points to In re Sakarias[31] as an example of a court finding inconsistent theories to be at odds with prosecutorial ethics. In Sakarias, the Supreme Court of California found that the prosecutor violated the defendant's due process rights through the use of inconsistent theories.[32] In two separate trials, the prosecutor secured a death sentence against two co-defendants by arguing that each inflicted *all* of the chopping hatchet wounds on the victim, even though the evidence suggested that each had inflicted only *some* of the wounds.[33] In Sakarias's trial, the prosecutor avoided introducing evidence that suggested some of the blows were delivered after the victim's death.[34]

---

[29] Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 2d 1314 (1935).

[30] Id.

[31] 106 P.3d 931 (Cal. 2005).

[32] Id. at 934.

[33] Id. at 936.

[34] Id. at 937

As with many of the other cases cited by Appellant, Sakarias involves a prosecutor manipulating the facts in order to gain multiple convictions for the same act, and arguing irreconcilably inconsistent theories. In the instant case, the prosecutor did not act in bad faith. The Commonwealth's change in theory was based on newly discovered information, and the Commonwealth sought to correct its inconsistent theories by amending Gary's sentence. The Commonwealth acted in good faith.

For these reasons, the prosecutors did not violate any ethical duty by using different theories in the two trials. The Commonwealth did not violate its duty to see that justice be done.

3.    Admissibility of Prosecutor's Statements from Gary's Trial Regarding Gary's Credibility

Appellant argues that the trial court erred in refusing to admit the prosecutor's statements from Gary's trial regarding Gary's truthfulness and credibility. According to Appellant, the trial court unfairly prohibited him from showing the jury that the prosecutor had believed Gary to be a liar. Appellant argues that the prosecutor's statements during Gary's trial regarding Gary's truthfulness and credibility were adoptions of the Commonwealth, and therefore not hearsay pursuant to KRE 801A(b)(2).[35]

The standard of review for the admission of evidence is whether the trial court has abused its discretion.[36] The test for determining whether the trial court abused its discretion is "whether the trial judge's decision was arbitrary, unreasonable, unfair, or

---

[35] "Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."

[36] Goodyear Tire & Rubber Co. v. Thompson, 11 S.W.3d 575, 577 (Ky. 2000); Commonwealth v. English, 993 S.W.2d 941, 945 (Ky.1999).

18

unsupported by sound legal principles."[37] We conclude that the trial court did not abuse its discretion by refusing to admit the prosecutor's statements from Gary's trial.

This Court has never addressed the issue of whether a prosecutor's statements from a prior trial are excluded from the hearsay rule, and thus admissible as adoptions of the Commonwealth. Appellant points to United States v. McKeon[38] from the Second Circuit for the proposition that the prosecutor's statements in Gary's trial were adoptions of the Commonwealth and therefore admissible. In McKeon, the prosecution sought to introduce defense counsel's statements from an earlier trial that ended in a mistrial.[39] In the defense counsel's statements from the previous trial, he had depicted the defendant's wife's role differently than he had in the new trial.[40]

The court concluded that there was no *per se* rule barring the use of counsel's statements from an earlier trial.[41] "Assertions of fact" by counsel from an earlier trial are admissible when they are inconsistent with a later position and are equivalent to a "testimonial statement" by the party.[42] While we do not decide whether to adopt the Second Circuit's approach under McKeon in Kentucky, we conclude that the prosecutor's statements are not admissible, even under McKeon.

While McKeon concluded that counsel's earlier statements are admissible in some circumstances, that admissibility was "tightly circumscribed."[43] The McKeon court stated that "[s]peculations of counsel, *advocacy as to the credibility of witnesses,*

---

[37] English, 993 S.W.2d at 945.

[38] 738 F.2d 26 (2d. Cir. 1984).

[39] Id. at 28.

[40] Id.

[41] Id. at 31 ("We believe that prior opening statements are not *per se* inadmissible in criminal cases.").

[42] United States v. DeLoach, 34 F.3d 1001, 1005 (11th Cir. 1994) (stating the holding of McKeon, 738 F.2d at 33). While McKeon dealt with statements by defense counsel, DeLoach applied McKeon to arguments by the prosecutor. DeLoach, 34 F.3d at 1005.

[43] DeLoach, 34 F.3d at 1005.

19

arguments as to weaknesses in the prosecution's case or *invitations to a jury to draw certain inferences* should not be admitted."[44]

Even under McKeon, the prosecutor's statements in Gary's trial are not admissible. Statements about Gary's truthfulness could be both "advocacy as to the credibility of witnesses" and "invitations to a jury to draw certain inferences." These are exactly the type of statements that the Second Circuit, in McKeon, sought to avoid admitting.

The McKeon court also believed that, for an attorney's prior statement to be admissible, "[t]he inconsistency . . . should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial."[45] The inconsistency in the prosecutor's statements at Gary's trial and Appellant's trial is quite clear. However, the fact that significant new information came to light between the two trials creates a "need for the trier of fact to explore other events."

Introduction of the prosecutor's earlier statements from Gary's trial would raise a number of questions in the minds of the jurors. This would necessitate a response from the Commonwealth explaining what led it to change its theory as to Gary's involvement. This would be difficult—if not impossible—without calling the prosecutor in Appellant's trial as a witness to testify as to his thoughts and beliefs in Gary's trial.[46] McKeon sought to limit the admission of counsel's prior statements to situations where the inconsistency is clear, and further explanation is not required. Such would not be the case here.

---

[44] 738 F.2d at 33 (emphasis added).

[45] Id.

[46] This could have been an option for Appellant. When defense counsel attempted to introduce the prosecutor's statements from Gary's trial, the prosecutor said that he would be willing to testify as a witness in the case. This would have allowed defense counsel to thoroughly explore the Commonwealth's earlier statements without creating a hearsay problem.

20

Furthermore, even if the prosecutor's statements *were* admissible, the exclusion by the trial court would be harmless error. An error is harmless when there is "no reasonable possibility that it affected the verdict."[47] Defense counsel argued in both opening and closing that Gary was a liar. In addition, the Commonwealth admitted that Gary had lied (although to a lesser degree than the defense pointed out) and informed the jury that Gary had been convicted for his role in Kiphart's death. Furthermore, defense counsel subjected Gary to rigorous cross-examination, during which Gary repeatedly admitted to lying to the police.

It seems unlikely that the prosecutor's statements would have changed the jury's determination of Gary's credibility. Appellant had multiple opportunities to show that Gary was dishonest, and took full advantage of these opportunities. Nevertheless, the jury presumably believed Gary's testimony and convicted Appellant. Given the extensive evidence of Gary's dishonesty, any improper exclusion of the prosecutor's statements that Gary was a liar would be harmless error.

The Commonwealth's earlier theory did not preclude Appellant's involvement in Kiphart's murder. In addition, significant new information supported the Commonwealth's changed theory. For these reasons, the Commonwealth's differing theories as to Gary's involvement in the murder did not violate Appellant's due process rights. For similar reasons, the prosecutor did not violate any ethical duty. Finally, the trial court did not abuse its discretion in excluding the prosecutor's statements from Appellant's trial. For these reasons, we conclude that Appellant's rights to due process and fundamental fairness were not violated.

B.     Prosecutor's Statements About Defense Counsel's Ethical Duty

---

[47] Emerson v. Commonwealth, 230 S.W.3d 563, 570 (Ky. 2007).

21

After Appellant turned himself in, Detective Mark Fulmore questioned him. Detective Fulmore asked Appellant whether he knew Kiphart. Although Appellant initially denied knowing Kiphart, Appellant eventually admitted to having spoken to Kiphart about Kiphart's car. At trial, during cross-examination, Appellant stated that he had previously seen Kiphart. However, for the first time, Appellant stated that he had seen Kiphart in a burgundy or cranberry-colored SUV. Witnesses had seen this color SUV and Gary's car together at the cemetery. Appellant's new statement suggested that Gary and Kiphart were at the cemetery at the same time. Appellant stated that he had never seen Kiphart in Kiphart's car (the car from which the stereo was stolen), despite having previously told Detective Fulmore that he had spoken to Kiphart about his car.

During the Commonwealth's closing argument, the prosecutor pointed to a number of inconsistencies in Appellant's story. The prosecutor stated that Appellant claimed, for the first time during cross-examination, to have seen Kiphart in an SUV. The prosecutor went on to comment on the professional responsibility of lawyers:

> Another thing I think is telling about that SUV comment is how it came up here in trial. [Appellant] testified to it, but not during his direct examination. It came up on cross-examination. . . . [Lawyers are] professionals. There are rules that we have to live by. A lawyer cannot ask a question when he knows the answer would be a lie. So they [the defense counsel] didn't.

Appellant's counsel objected to the prosecutor's statement and moved for a mistrial. The trial judge sustained the objection, but denied Appellant's request for a mistrial, and instead admonished the jury to "disregard . . . any comment about professional ethics or responsibilities that a lawyer has in a case . . . . It was not part of

22

the trial, so disregard that please." Later, defense counsel again requested a mistrial, but did not ask for any further admonishment.

Appellant argues that the trial court erred in refusing to grant a mistrial after the prosecutor commented on the ethical duty of attorneys. Appellant contends that a mistrial was the only appropriate remedy.

A trial court should only grant a mistrial when a "manifest necessity" exists to do so.[48] The standard of review for denial of a mistrial is whether the trial court abused its discretion.[49] A trial court abuses its discretion only when "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[50]

For prosecutorial misconduct in a closing argument, this Court, in Barnes v. Commonwealth,[51] adopted the Sixth Circuit's test from United States v. Carroll.[52] Under Barnes and Carroll, the first step is to determine whether the prosecutor's remarks were improper.[53] If the remarks were improper:

> [W]e reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" *or* if each of the following conditions is satisfied:
>
> (1) Proof of defendant's guilt is not overwhelming;
> (2) Defense counsel objected; and
> (3) The trial court failed to cure the error with a sufficient admonishment to the jury.[54]

In determining whether the misconduct is "flagrant," we consider four factors:

---

[48] Martin v. Commonwealth, 170 S.W. 3d. 374, 381 (Ky. 2005) (citing Maxie v. Commonwealth, 82 S.W.3d 860, 863 (Ky. 2002)).

[49] Shabazz v. Commonwealth, 153 S.W.3d 806, 811 (Ky. 2005).

[50] English, 993 S.W.2d at 945

[51] 91 S.W.3d 564, 568 (Ky. 2002).

[52] 26 F.3d 1380, 1385-86 (6th Cir. 1994).

[53] Id. at 1385.

[54] Barnes, 91 S.W.3d at 568 (emphasis in original).

23

(1) whether the remarks tended to mislead the jury or to prejudice the accused;

(2) whether they were isolated or extensive;

(3) whether they were deliberately or accidentally placed before the jury; and

(4) the strength of the evidence against the accused.[55]

In evaluating the first of these factors, we consider whether the trial judge gave the jury an appropriate admonishment.[56] These two sets of factors overlap to some extent.[57]

First, we conclude that the prosecutor's remarks were in fact improper. An attorney may not allude to any matter that the lawyer does not reasonably believe will be supported by admissible evidence.[58] It is also improper for an attorney to assert personal knowledge.[59] In addition, a prosecutor "may not testify" and "is limited to fair argument on matters in the record and legitimate deductions therefrom."[60] Neither the Commonwealth nor the Appellant admitted any evidence of a lawyer's ethical duties or responsibilities. It was improper for the prosecutor to instruct the jury about defense counsel's ethical duties when defense counsel had not had a chance to address this during the trial. It was also improper for the prosecutor to assert his personal knowledge of ethical standards. We conclude that the trial court properly ruled that the prosecutor's remarks were improper.

Next, we address whether the prosecutor's misconduct qualifies as "flagrant." We therefore first consider whether the prosecutor's remarks tended to mislead the jury

---

[55] Carroll, 26 F.3d at 1385.

[56] Id. ("The first factor includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury.")

[57] Id.

[58] SCR 3.130-3.4(e) ("[A lawyer shall not] allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to . . . the credibility of a witness.")

[59] Id.

[60] Bowler v. Commonwealth, 558 S.W.2d 169, 172 (Ky. 1977).

or prejudice the Appellant. The prosecutor's statements about counsel's ethical duties, while true, could certainly have suggested to the jury that Appellant lied, and that defense counsel knew Appellant to be lying. However, the trial court judge immediately admonished the jury to disregard any statements about a lawyer's ethical duty. "A jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error."[61] Here, there is no evidence that the prosecutor's single comment about a lawyer's ethical duty continued to prejudice the accused following the court's admonition.

The Commonwealth argued extensively in its closing that Appellant had lied on multiple occasions. While suggesting that Appellant's attorneys knew him to be lying was certainly improper, it was not the only comment which might have led the jury to infer that Appellant was not credible. Because the Commonwealth produced a great deal of evidence that Appellant was not credible, it would be difficult to say that, after an admonishment, the prosecutor's improper comment unfairly prejudiced Appellant.

The next factor we consider is whether the prosecutor's comments were isolated or extensive. The prosecutor only once referred to an attorney's ethical responsibilities. After the trial judge ruled that the statement was improper, the prosecutor did not raise the issue again. It is true that the Commonwealth continued to mention to the jury that Appellant's SUV statement came up for the first time on cross-examination. But given the trial judge's admonition, and the other examples mentioned in the Commonwealth's closing, the prosecutor's improper statement was a rather isolated occurrence.

Next, we consider whether the improper statements were deliberately or accidentally placed before the jury. The Commonwealth argues that the statements

---

[61] Johnson v. Commonwealth, 105 S.W.3d 430, 441 (Ky. 2003) (citing Mills v. Commonwealth, 996 S.W.2d 473, 485 (Ky. 1999)).

were accidental and "seemed to flow from the prosecutor's argument about Appellant's ever evolving statement." While the prosecutor's statement may have naturally flowed from his earlier comment, we find it hard to believe that the prosecutor's statement was not deliberate. It seems highly unlikely that the prosecutor would accidentally comment on the ethical and professional responsibilities of an attorney. This comment appears to have been planned by the Commonwealth, and to have been deliberately placed before the jury.

Finally, in determining whether the prosecutor's misconduct was flagrant, we must look to the strength of the evidence against the accused. As stated previously, Appellant's SUV comment was by no means the Commonwealth's only example of inconsistencies in Appellant's statements. The Commonwealth asserted other examples from which the jury could have inferred that Appellant was not truthful. In addition, the Commonwealth had other evidence linking Appellant to Kiphart's murder. In Appellant's statement to the police, after mentioning Kiphart's tires without being asked about them, Appellant stated, "You got me there" and "I should have asked for a lawyer." Luis Baez also identified Appellant from a photo pack as one of the men stripping Kiphart's car. The Commonwealth also presented extensive testimony from Gary Hearn regarding Appellant's involvement in Kiphart's death. The Commonwealth presented substantial evidence of Appellant's guilt.

With regard to whether the prosecutor's misconduct qualifies as "flagrant," three of the four factors favor the Commonwealth. Because of the trial judge's admonishment to the jury, it cannot be said that the prosecutor's improper comments unfairly misled the jury or prejudiced Appellant. The prosecutor's improper comments were isolated to a single occurrence. And the Commonwealth presented substantial evidence of

26

Appellant's guilt. Although the Commonwealth's improper remarks were likely intentional, we conclude, on balance, that the factors favor the Commonwealth. We conclude that the prosecutor's misconduct was not flagrant.

Even if a prosecutor's misconduct is not flagrant, the conduct may still warrant reversal if proof of the defendant's guilt is not overwhelming, defense counsel objected, and the trial court failed to cure the error with a sufficient admonishment. Appellant argues that the trial court's admonishment was insufficient to cure the error. The trial court, Appellant argues, left intact the prosecutor's implication that defense counsel knew that Appellant was lying about the SUV. Further, Appellant argues that this partial admonishment served to reinforce the implication that Appellant was lying.

First, we believe that the trial judge's admonishment to the jury was sufficient. The prosecutor did not separately state that Appellant's attorneys knew he was lying. Instead, this was implied from the prosecutor's statement about the ethical duty of attorneys: "A lawyer cannot ask a question when he knows the answer would be a lie. So they didn't." Given the nature of the prosecutor's statement, a reasonable jury could infer from an admonishment to "disregard . . . any comment about professional ethics or responsibilities that a lawyer has in a case" that it should also disregard any implications arising from those comments.

Furthermore, even if the trial judge's admonishment was insufficient to cure the prosecutor's error, defense counsel did not request a further admonition. After the trial judge denied Appellant's request for a mistrial, the judge admonished the jury to disregard statements about ethical responsibilities. Defense counsel made no further objections until a request for a mistrial at the conclusion of the trial.

It is well settled that a failure to request an admonition is generally regarded as trial strategy, and that a failure to request an admonition waives the issue on appeal.[62] While no prior cases specifically address this point, we believe that, after the trial judge denied Appellant's second request for a mistrial, it was incumbent upon defense counsel to request a further admonition.

Defense counsel could have easily requested that the judge admonish the jury to disregard comments suggesting that Appellant's attorneys knew that he had lied. Most likely, defense counsel chose not to request such an admonition because it would have drawn further attention to Appellant's statements and the prosecutor's argument. This is a matter of trial strategy, and we will not reverse based on defense counsel's decision not to request that the jury be further admonished.

For non-flagrant prosecutorial misconduct to result in reversal, each of the three conditions under Barnes must be satisfied. Because we conclude that the trial court provided a sufficient admonishment to the jury, the third condition is not satisfied. Therefore, we do not address the question of whether evidence of Appellant's guilt was "not overwhelming." Because the prosecutor's misconduct was not flagrant, and because the conditions for reversal for non-flagrant conduct have not been met, we conclude that the trial court's admonishment to the jury was sufficient. Therefore, the trial court did not err when it refused to grant a mistrial.

C.    The Photo Lineup

The day of Kiphart's death, a police officer discovered Kiphart's car, stripped and on blocks, in an apartment complex. While canvassing the area, the police learned that

---

[62] See, e.g., Ernst v. Commonwealth, 160 S.W.3d 744, 759 (Ky. 2005) ("We have held that such admonitions are required only 'upon request' and that the failure to request an admonition is generally regarded as trial strategy."); Hall v. Commonwealth, 817 S.W.2d 228, 229 (Ky. 1991), overruled on other grounds by Commonwealth v. Ramsey, 920 S.W.2d 526 (Ky. 1996) (holding that not requesting an admonition is an issue of trial strategy, and thus waives the issue on appeal).

28

Luis Baez had observed persons stripping the car. Baez saw the men through the window of his ground-level apartment at approximately 2 p.m. or 3 p.m. on the day of Kiphart's death. He identified the persons as young, black males. According to Baez, the men put Kiphart's tires into a Jeep or SUV, and quickly drove off. It was at this point, Baez testified, that he "knew that they had done something wrong." Baez did not consider the men's behavior suspicious prior to their quick exit. Baez stated that he observed the men until they pulled away, but was uncertain as to the length of time.

Several days later,[63] Detective Terry Jones returned to Baez's apartment. Because Baez is Cuban and did not speak English, Officer Willie Ortiz accompanied Jones to interpret. Officer Ortiz is fluent in both English and Spanish. Officer Ortiz testified that he interpreted exactly what Detective Jones said, and that he did not add any other information. Other than his interpreting duties, Officer Ortiz was not involved in the investigation of Kiphart's death.

Detective Jones brought with him two photo packs, each of which contained photos of six men on one page. Each of the two photo packs contained a picture of one suspect. One pack contained Gary Hearn, while the other contained Appellant. The other five men in each photo pack were "decoys" with similar characteristics to the suspect. Detective Jones knew which man was the target in each pack, but Officer Ortiz and Mr. Baez did not. No one suggested to Baez which men were suspects.

At trial, Detective Jones testified several times to the effect that he asked Baez to identify the man he saw at Kiphart's car. For example, Jones stated on direct examination, "I wanted him [Baez] to view the photo pack to identify the person he saw removing the rims from the vehicle." Baez examined each photo pack "at his leisure."

---

[63] Baez could not recall exactly how many days later he spoke to the police, but he stated that it was "a couple days after" the incident with Kiphart's car. According to the Commonwealth, the police returned three days later.

29

In the photo pack containing Gary, Baez did not identify any of the men. In the photo pack containing Appellant, Baez identified Appellant as a person he saw stripping Kiphart's car. However, when Baez testified at trial, he was unable to identify Appellant in court.

Appellant argues that the photo pack procedure used by the police with Luis Baez was unduly suggestive. Appellant therefore argues that it was error not to suppress the evidence of the photo lineup.

First, we note that "[t]he lack of an in-court identification merely goes to the weight, and not to the admissibility, of the evidence."[64] In McCloud, much like this case, a witness identified the defendant from a photo pack, but was unable to make an in-court identification.[65] This Court determined that the extra-judicial photo pack identification was admissible without an in-court identification.[66] The failure to make an in-court identification goes only to the weight of the evidence.[67]

Next, we note again that the standard of review for the admissibility of evidence is abuse of discretion.[68] This is a question of "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[69]

In examining a pre-trial identification, we must "first determine whether the confrontation procedures employed by the police were 'suggestive.'"[70] If we conclude

---

[64] McCloud v. Commonwealth, 698 S.W.2d 822, 823 (Ky. 1985).

[65] Id.

[66] Id.

[67] Id.

[68] Goodyear, 11 S.W.3d at 577.

[69] English, 993 S.W.2d at 945.

[70] Wilson v. Commonwealth, 695 S.W.2d 854, 857 (Ky. 1985).

that the procedures were not suggestive, then the analysis ends.[71] If we conclude that

the procedures *were* suggestive, then we must determine "whether under the totality of

the circumstances the identification was reliable even though the confrontation

procedure was suggestive."[72]

Appellant claims that the procedures employed by Detective Jones were unduly

suggestive, because Detective Jones asked Baez to identify the man he saw near

Kiphart's car. The implication was that the photo pack contained a picture of a suspect.

We agree that suggesting that a witness should "identify the person he saw" is

not an ideal, or even a desirable, police procedure. However, we agree with the

Supreme Court of Connecticut's position on this issue:

> A statement of the police that a suspect is included in the
> photographic array or in a line-up should be considered in
> determining whether it was unduly suggestive, but little harm
> is likely to arise when the witness, even without the police
> comment, would have inferred that the occasion for his being
> requested to identify someone is that the police have a
> particular person in mind who has been included among
> those to be viewed.[73]

A police officer's implication that the suspect is included in the photo pack or

lineup is one factor to consider in determining whether the procedures are suggestive.[74]

However, this implication alone is unlikely to render the procedures suggestive. A

---

[71] King v. Commonwealth, 142 S.W.3d 645, 649 (Ky. 2004).

[72] Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (internal quotations omitted). This is because "the primary evil to be avoided" is the possibility of misidentification. *Id.* at 198. See also Savage v. Commonwealth, 920 S.W.2d 512, 513 (Ky. 1995) (applying the Biggers test).

[73] State v. Austin, 488 A.2d 1250, 1253 (Conn. 1985). In Austin, the victim looked through a tray of seventy-five mug shots. Id. at 1252 After the victim gave the police some idea of her attacker's characteristics, the police officer, in the presence of the victim, told another officer to bring in another tray and "put Richard Austin's picture in it." Id. The victim, however, did not know at that time who Richard Austin was. Id. at 1254.

[74] See State v. King, 915 A.2d 587, 596 (N.J. 2007) ("Types of factors to be considered include whether the police told the eyewitness that the photo array contains a picture of a suspect, although that alone is not determinative.").

witness can easily infer that the police already have a suspect in mind, and that that suspect is likely included in the photo pack. Mr. Baez, through his own common sense, could have determined that each photo pack contained a suspect. Therefore, the implication that the suspect is included is not, by itself, enough to make the photo procedure suggestive.

In this case, additional factors cut against Appellant's argument that the photo pack was suggestive. Baez identified Appellant in his photo pack. However, in the photo pack containing Gary's picture, Baez did not make an identification. This suggests that Baez did not feel pressured by the police to make an identification. In addition, while Detective Jones suggested that the suspects were in the photo pack, he never plainly told Baez that the photos did in fact contain the suspects.

Appellant has pointed to nothing else about the photo lineup that shows it to be suggestive. Appellant cites one case[75] for the proposition that a police officer telling a witness that the suspect is in the photo array makes the array suggestive. However, many other factors in that case made the photo array suggestive,[76] and the police officer's actions were only one factor.[77]

Because we conclude that the photo pack was not suggestive, we do not consider whether the identification was reliable under Neil v. Biggers. We conclude that the procedures used by the police, while not perfect, do not rise to the level of being suggestive. Therefore, the trial court did not abuse its discretion when it denied Appellant's motion to suppress the evidence of Mr. Baez's identification of Appellant.

---

[75] Id.

[76] Id. at 597 (holding that the photo array was suggestive because police officers suggested to the witness that they had a suspect, but also because two persons in the photo array were older and only the suspect had a scar on his face).

[77] Id. at 596.

32

## IV. CONCLUSION

Because the Commonwealth's two theories of Gary Hearn's involvement were not mutually exclusive with regard to Appellant, and because the change in theory was supported by new information, the Commonwealth did not violate Appellant's rights to due process or fundamental fairness. For similar reasons, the Commonwealth's prosecutors did not violate their ethical duty by using different theories. In addition, the trial court did not err in refusing to admit into evidence the prosecutor's statements from Gary's trial. The prosecutor's comments about defense counsel's ethical duties were improper, but were cured by an admonition from the trial court. And finally, the photo lineup procedure used by the police was not suggestive. For these reasons, the judgment of the Jefferson Circuit Court is hereby affirmed.

All sitting. All concur, except Venters, J., not sitting.

COUNSEL FOR APPELLANT:

Randall L. Wheeler
Assistant Public Advocate
100 Fair Oaks Lane, Suite 302
Frankfort, KY 40601

COUNSEL FOR APPELLEES:

Jack Conway
Attorney General
Criminal Appellate Division
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY 40601

Jeanne Deborah Anderson
Assistant Commonwealth's Attorney
514 West Liberty Street
Louisville, KY 40202

Teresa Ann Young
Assistant Commonwealth's Attorney
514 West Liberty Street
Louisville, KY 40202